735 S.E.2d 727

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Robert FRAZIER, Defendant Below, Petitioner.**

No. 11–0691.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 17, 2012.

Decided Nov. 20, 2012.

Crystal L. Walden, Esq., Deputy Public Defender, Office of the Public Defender, Charleston, WV, for Petitioner.

Darrel V. McGraw, Jr., Attorney General, Thomas W. Rodd, Esq., Assistant Attorney General, Charleston, WV, for Respondent.

KETCHUM, Chief Justice:

The defendant, Robert Frazier, appeals his conviction of the second degree murder of his former girlfriend, Kathy Smith. In support of his appeal the defendant has submitted several assignments of error. The State has conceded error with regard to two of those assignments; however, it argues that the errors are harmless.

### The Conceded Errors

The first error conceded by the State involves the defendant's fundamental constitutional right to confront the witnesses against him. The prosecution entered into evidence an autopsy report without testimony by the forensic pathologist who performed the autopsy.

The second error which the State concedes is the prosecution's failure to give the defendant exculpatory evidence before trial. The prosecution is constitutionally required to timely disclose all exculpatory information in its possession.

The State concedes these errors occurred, but contends they were harmless. The United States Supreme Court has repeatedly held that errors affecting rights guaranteed to a defendant by the *United States Constitution* are harmless only if the prosecution can prove, beyond a reasonable doubt, that there is *no reasonable possibility* that the

errors committed by the prosecution contributed to the defendant's conviction. The State has failed to prove that the constitutional errors the prosecution created were harmless beyond a reasonable doubt. Accordingly, we reverse the defendant's conviction and remand this matter for a new trial.

### I. *Background*

On August 25, 2008, Cabell County Metro 911 received a call reporting a shooting at the defendant's house. Arriving at the scene, emergency responders discovered the body of the defendant's girlfriend, Kathy Smith, lying on a bedroom floor. The defendant was not in the house when the emergency responders arrived.

Within hours of the shooting, law enforcement investigators obtained a statement from the defendant. In his initial statement the defendant accused another person of shooting Miss Smith during an argument over drugs. When investigators told the defendant they did not believe him, the defendant changed his story. In his amended statement the defendant said that he and Miss Smith had been arguing. During the argument Miss Smith walked away from the defendant and went into her bedroom. The defendant said he followed her into the bedroom after a few minutes, and that when he entered Miss Smith pulled a "loaded and cocked" shotgun on him. The defendant stated that he acted in self-defense and tried to get the gun from her, but as they struggled the gun accidently discharged and Miss Smith was killed. There were no eyewitnesses to the events that transpired in the bedroom.

Miss Smith's body was sent to the Office of the State Medical Examiner where Dr. Richard Belding, a Deputy Assistant Medical Examiner, conducted a forensic investigation into the circumstances of her death. During the course of his investigation Dr. Belding spoke with law enforcement officers concerning information known to them regarding the circumstances of Miss Smith's death. Dr. Belding also created notes and drafted a "Clinical Summary" during the course of his investigation. The typewritten Clinical Summary, which contains handwritten insertions (as noted in italics), states

Kathryn Gail Smith was a 53 year old white woman who, after threatening to ~~through~~ *throw* her boyfriend out of the trailer, walked into a bedroom and seized a single barrel shotgun. The boyfriend took the shotgun from her and shot her in the face. The boyfriend was subsequently arrested and ~~reportedly~~ *has* confessed. *There was a witness.*

Upon completing the investigation, Dr. Belding prepared an autopsy report which concluded that Miss Smith's death was a homicide.

The defendant was indicted for first degree murder. Prior to trial, the defendant's lawyers filed discovery motions requesting that the prosecution disclose the names of all witnesses that it intended to call at the defendant's trial, and that the defendant be provided with all witness statements. Defense counsel filed a separate motion seeking to require the prosecution to provide "any and all exculpatory and impeachment materials favorable to the [defendant] which negate or tend to negate guilt for the offenses alleged or which may mitigate punishment."

After significant delays, and two status conferences, the prosecution responded to the defendant's discovery requests by providing defense counsel with a copy of Dr. Belding's autopsy report, and notifying the defendant that it would call Dr. Belding as an expert witness. However, the prosecution did not provide Dr. Belding's notes or his Clinical Summary.

On July 7, 2010, the defendant's trial began. The prosecution did not call Dr. Belding as a witness, but instead called Dr. James Kaplan, the Chief Medical Examiner for the State of West Virginia. Defendant's counsel immediately objected, arguing that they were "never informed that Dr. Kaplan was a witness," and that the prosecution had only identified Dr. Belding as the witness it would call from the Medical Examiner's Office. The defense argued that allowing Dr. Kaplan to testify as to Dr. Belding's findings and the autopsy report would violate the defendant's right to confront witnesses against him. In support of this argument defense counsel stated that Dr. Kaplan did not perform the

autopsy, did not talk to the officers who provided information to Dr. Belding, and that Dr. Kaplan did not observe Dr. Belding perform the autopsy. Defense counsel argued that it could not "cross-examine Dr. Kaplan about what Dr. Belding did. He didn't see anything. He didn't speak to all these officers that Dr. Belding was relying on when he was doing his examination."

The prosecution argued that Dr. Kaplan was the supervising Medical Examiner, that he signs off on all autopsy reports, and that he could testify as an expert witness. The trial court asked the prosecution whether Dr. Kaplan was "going to testify for the other doctor that did the autopsy." The prosecution responded that the "other doctor [Dr. Belding] did the autopsy, but [Dr. Kaplan] is going to testify to the report."

The trial court overruled the defense's objection, finding that Dr. Kaplan could "testify from the report" because it was prepared in the ordinary course of business.

During the course of Dr. Kaplan's testimony the defendant first learned that Dr. Belding had created notes and a Clinical Summary. At this point copies were given to the defendant's lawyers. After reviewing these documents defense counsel renewed the objection to Dr. Kaplan's testimony on confrontation grounds. The defense also moved to dismiss the charges against the defendant for the prosecution's failure to disclose Dr. Belding's notes and Clinical Summary. The defense argued that Dr. Belding's notes were exculpatory because one of them listed the circumstances of Miss Smith's death as "possible accidental." The Clinical Summary was exculpatory, the defense argued, because it stated that it was Miss Smith who threatened the defendant and brandished the shotgun. This statement was consistent with the defendant's explanation that Miss Smith was the aggressor and pulled the gun on him, and it was contrary to the prosecutor's theory of the case that the defendant was the aggressor and pulled the gun on Miss Smith.

In response to the motion to dismiss the prosecutor explained that it had "just received" the exculpatory materials that day and that it "[d]idn't know it existed" before Dr. Kaplan mentioned it in his testimony.

The prosecutor argued that this "goes to show that we did not have any intent to withhold exculpatory evidence" and, therefore, that the prosecution "did not create any prosecutorial misconduct." During further argument on the issue, the prosecutor revealed that it learned of Dr. Belding's termination approximately two months prior to the beginning of the defendant's trial.

The trial court denied the motion to dismiss, finding that the Medical Examiner's failure to disclose the additional evidence could not be blamed on the prosecution.

On July 12, 2010, a jury found the defendant guilty of the lesser offense of second degree murder. The trial court later sentenced the defendant to forty years imprisonment. It is from this conviction and sentence that he now appeals.

## II. *Discussion*

■ The defendant first argues that Dr. Belding's autopsy report was "testimonial" in nature because it was used by the prosecution to show he committed a crime. The defendant argues that under the Confrontation Clause of the United States and West Virginia Constitutions, the report should not have been admitted into evidence without Dr. Belding testifying to, and being cross-examined about, its findings and conclusions. This error, the defendant argues, was compounded when the trial court allowed Dr. Kaplan, a surrogate witness, to testify to Dr. Belding's findings, conclusions, and ultimate opinion contained in the autopsy report. The State concedes that these were constitutional errors, but insists that they were harmless.

This Court has consistently held that a trial court's rulings on the admissibility of evidence, "including those affecting constitutional rights, are reviewed under an abuse of discretion standard." *State v. Marple*, 197 W.Va. 47, 51, 475 S.E.2d 47, 51 (1996). In Syllabus Point 1 of *State v. Shrewsbury*, 213 W.Va. 327, 582 S.E.2d 774 (2003), we explained that "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *Accord* Syllabus Point 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469

(1998) ("A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.").

The Confrontation Clause found in the Sixth Amendment to the *United States Constitution*, and Section 14 of Article III of the *West Virginia Constitution*, guarantee a criminal defendant the right to confront and cross-examine witnesses against him. In Syllabus Point 1 of *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), *overruled on other grounds by State v. Mechling*, 219 W.Va. 366, 373, 633 S.E.2d 311, 318 (2006), we explained that

> The mission of the Confrontation Clause found in the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* is to advance a practical concern for the accuracy of the truth-determining process in criminal trials, and the touchstone is whether there has been a satisfactory basis for evaluating the truth of the prior statement. An essential purpose of the Confrontation Clause is to ensure an opportunity for cross-examination. In exercising this right, an accused may cross-examine a witness to reveal possible biases, prejudices, or motives.

█ The Confrontation Clause prohibits the prosecution from introducing "testimonial statements" of a witness who does not appear at trial. The only exception is where the witness is unavailable to testify, and the defendant had a prior opportunity to cross-examine that witness. *State v. Mechling*, 219 W.Va. at 373, 633 S.E.2d at 318.

The question that arises is: When does a written report become a testimonial statement? We set forth our standard for making this determination in Syllabus Point 8 of *State v. Mechling*:

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution*, a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial.

Syllabus Point 8 of *Mechling* reflects the "primary purpose" test described by the United States Supreme Court in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In *Davis* the Court held that a hearsay statement, introduced to prove the truth of the matter asserted, is testimonial when the primary purpose of the statement is to establish or prove past events potentially relevant to later criminal prosecutions. The Supreme Court later held that reports meeting the primary purpose test are testimonial statements. *See e.g., Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), and *Bullcoming v. New Mexico*, 564 U.S. ——, 131 S.Ct. 2705, 2714 n. 6, 180 L.Ed.2d 610 (2011).

The next logical question is whether Dr. Belding's autopsy report was prepared to establish or prove past events potentially relevant to later criminal prosecutions and, therefore, meets the primary purpose test. The answer to this is an unqualified yes. In West Virginia an autopsy report in suspected homicide cases is authorized by *W.Va. Code* § 61–12–10 [2012]. Subsection (c) mandates that the "chief medical examiner shall keep full, complete and properly indexed records of all deaths investigated, containing all relevant information concerning the death and the autopsy report if an autopsy report is made." Subsection (c) also provides that "[a]ny prosecuting attorney or law-enforcement officer may secure copies of these records or information necessary for the performance of his or her official duties." Subsection (d) provides that copies of the "records or information shall be furnished, upon request, to any court of law, or to the parties therein to whom the cause of death is a material issue[.]" In addition, *W.Va.Code* § 61–12–13 [2010], *mandates* that autopsy reports be admitted into evidence: "Reports of investigations and autopsies, and the records thereof, on file in the office of the chief medical examiner or in the office of any county medical examiner, *shall be received as evidence* in any court or other proceeding . . . ." (Emphasis added.).

It is clear that, under *W.Va.Code* §§ 61-12-10 and -13, an autopsy report prepared in a homicide case has the primary purpose of establishing or proving past events (facts) potentially relevant to a later criminal prosecution, and is therefore a testimonial statement.

In Syllabus Point 6 of *State v. Mechling, supra*, we set forth our standard for admission of a testimonial statement by a witness who was not appearing at a defendant's trial:

> Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

Under Syllabus Point 6 of *Mechling* the prosecution was required to prove two things before Dr. Belding's autopsy report could be admitted into evidence, and before Dr. Kaplan could be permitted to testify to its contents. First, the prosecution was required to show that Dr. Belding was unavailable to testify at the defendant's trial. Second, the prosecution was required to show that the defendant had a prior opportunity to cross-examine Dr. Belding.

There is no evidence in the record that Dr. Belding was unavailable to testify. The prosecution, as the defendant strenuously argues, knew for at least two months prior to the defendant's trial that Dr. Belding had been terminated and would not be called as a witness. However, despite having this knowledge, the prosecution did not disclose to the defendant, or to the trial court, that Dr. Belding would not be called until the first day of the defendant's trial. The record does not reflect that the prosecution made any effort to secure Dr. Belding's testimony.

Even were we to assume, *arguendo*, that the prosecution satisfactorily showed Dr. Belding to be unavailable to testify at the defendant's trial, the prosecution presented no evidence that the defendant had a prior opportunity to cross-examine Dr. Belding.

Accordingly, the prosecution failed to meet the second requirement set forth in Syllabus Point 6 of *Mechling*.

After reviewing the record, we agree with the State that it was error for the trial court to admit into evidence the autopsy report and to permit Dr. Kaplan to testify as a surrogate witness. The final issue remaining is the State's argument that these errors are harmless.

In *State v. Flippo*, 212 W.Va. 560, 581, 575 S.E.2d 170, 191 (2002), we noted that this Court has

> observed on numerous occasions that " '[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syl. pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975)." Syl. pt. 14, *State v. Salmons*, 203 W.Va. 561, 509 S.E.2d 842 (1998).
>
> . . .
>
> Moreover, " '[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction.' " *State v. Jenkins*, 195 W.Va. 620, 629, 466 S.E.2d 471, 480 (1995) (quoting, Syl. pt. 20, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974)). Consequently, "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot ... be conceived of as harmless." *Chapman*, 386 U.S. at 23–24, 87 S.Ct. at 828.

We made clear in *Flippo*, and today so hold, that in a criminal case, the "burden is upon 'the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Flippo, id.*, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Reviewing Dr. Belding's autopsy report we note two sections of particular relevance to our harmless error analysis. In the section titled "Findings," Dr. Belding found as follows:

Fatal firearm injury, reportedly in the setting of domestic violence; reportedly perpetuated by decedent's boyfriend, using a 12 gauge shotgun. Decedent and boyfriend were arguing in front of a second man. Decedent went into adjacent room, followed by boyfriend carrying a 12 gauge shotgun. The second man then heard the shotgun fired. A confession by the perpetrator has reportedly been obtained.

The report's final section, titled "Opinion," contains two subsections. The first subsection is titled "Cause of Death and Contributory Conditions/Factors." This section opines "that [Miss Smith] ... died as a result of reportedly being shot by her boyfriend, using a shotgun, at contact range." The second subsection, titled "Manner of Death" opines that Miss Smith's death was a "homicide."

A review of Dr. Kaplan's testimony shows that he repeated the contents of the autopsy report and its factual findings. One example of this is as follows:

**The prosecution:** Dr. Kaplan, could you talk to the jury, what angle was that shotgun per the report of Dr. Belding?

**Dr. Kaplan:** The direction of the fire is upward, which is the main component. So, it is sort of upward. It is front to back and from left to right.

So, it is sort of going in this direction. And I am pointing and I have my finger against where the wound was and the directionality.

The prosecution's theory of the case was that the angle of the shotgun blast was inconsistent with the defendant's claim of an accidental shooting.[1] Dr. Kaplan was not offering his own conclusions as to what the angle was, but was repeating Dr. Belding's findings on that key issue. This effectively denied the defendant his right to confront Dr. Belding about his conclusions.

On cross examination, Dr. Kaplan acknowledged that he did not personally observe the autopsy and did not speak with any of the investigating officers as part of the autopsy. However, Dr. Kaplan opined that Dr. Beld-

ing spoke with investigators and based his findings, in part, on his discussions with the investigative officers, although Dr. Kaplan said that he did not know what information the investigative officers gave to Dr. Belding. The defense also attempted to cross-examine Dr. Kaplan regarding contradictions between Dr. Belding's Clinical Summary and the autopsy report. These contradictions support the defendant's statement that it was Miss Smith who pulled the shotgun on him, and not the defendant who pulled the shotgun on Miss Smith. However, when the defense asked Dr. Kaplan about these discrepancies, Dr. Kaplan testified that

I don't know under what basis the areas where there is discrepancy between his [Dr. Belding's] Clinical Summary and the rest of the information that exists in the file in the form of police investigation and other records made by our office pertaining to our investigation into the death circumstances. And, so, I can't answer that question for you. I don't know where he came up with the discrepant findings that are of concern to you.

Similarly, when asked about Dr. Belding's notes, Dr. Kaplan testified that, *"I can't tell you where they came from, ma'am. You would have to talk to Dr. Belding."*

The defendant was unable to obtain an answer that would explain the discrepancies between the exculpatory notes made by Dr. Belding and the autopsy report signed by Dr. Belding. For instance, Dr. Belding noted in his Clinical Summary that it was Miss Smith who "threatened [the defendant] ... and walked into a bedroom and seized a single barrel shotgun," yet his autopsy report had a "finding" that it was the defendant who followed Miss Smith into an adjacent room carrying the shotgun. The defendant was prevented from seeking the answer to these questions because the witness who made the statements/conclusions/findings was not brought before the court as a witness.

The prosecution benefited from the introduction of the autopsy report and Dr. Kaplan's testimony relating the contents of that report. *The burden is upon the beneficiary*

---

1. The prosecution called a blood spatter expert who testified that the angle of the shooting was

inconsistent with the defendant's explanation of how Miss Smith came to be shot.

of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. The State has failed to demonstrate that the autopsy findings and conclusions did not contribute to the verdict. The prosecution did not meet its burden. Accordingly, the defendant's conviction must be reversed, and this matter remanded for a new trial consistent with this Opinion.

■ The second constitutional error conceded by the State is that the prosecution failed to timely disclose Dr. Belding's notes and a recorded statement of one of the prosecution's key witnesses. Our law is clear that the prosecutor, and any investigator acting on the prosecution's behalf, has a duty to disclose evidence favorable to the defendant. *State v. Youngblood,* 221 W.Va. 20, 650 S.E.2d 119 (2007). The State—wisely—admits that the prosecution's failure to promptly provide this evidence was an error of constitutional dimensions. However, because we are reversing the defendant's conviction on the prosecution's errors under the Confrontation Clause, and because this evidence will be available to the defendant on retrial, we need not address whether or not this error affected the outcome of the jury's decision.[2]

### III. *Conclusion*

For the reasons set forth in this Opinion, the defendant's conviction is reversed and this matter is remanded for a new trial.

Reversed and Remanded.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

BENJAMIN, Justice, dissenting:

Because the constitutional error regarding the confrontation clause was harmless beyond a reasonable doubt, I would affirm the petitioner's conviction.

The majority opinion finds reversible error in permitting Dr. Kaplan to testify to the contents of the autopsy report prepared by Dr. Belding on the basis that Dr. Belding's clinical summary contradicts the contents of

the autopsy report, and Dr. Belding was not available to be cross-examined on this matter. I disagree with the majority opinion because I believe that Dr. Kaplan's testimony and the autopsy report added nothing to the State's evidence against the petitioner, and that there is no contradiction between Dr. Belding's clinical summary and his autopsy report.

Dr. Belding's opinion in the autopsy report was as follows:

### OPINION

**CAUSE OF DEATH AND CONTRIBUTORY CONDITIONS/FACTORS:** It is our opinion that Kathryn Gail Smith, a 53 year old woman, died as a result of reportedly being shot by her boyfriend, using a shotgun, at contact range. Multiple birdshot pellets were recovered and retained.

**MANNER OF DEATH:** Homicide

Significantly, Dr. Belding's opinion was undisputed and does not conflict with the recorded statement of the petitioner who admitted to Detective Sperry that he shot the victim.

More importantly, Dr. Belding's opinion in no way contradicts his informal clinical summary in which he stated:

Kathryn Gail Smith was a 53 year old white female who, after threatening to [throw] her boyfriend out of the trailer, walked into a bedroom and seized a single shot barrel shotgun. The boyfriend took the shotgun from her and shot her in the face. The boyfriend was subsequently arrested and [reportedly] has confessed. There was a witness.

First, this statement is perfectly consistent with Dr. Belding's opinion in the autopsy report that Ms. Smith's death was a homicide. Second, this information clearly was not based on Dr. Belding's interpretation of physical evidence but apparently was told to him by Detective Sperry, who in turn obtained the information from the petitioner in a recorded statement. Specifically, the petitioner admitted to Detective Sperry on the day of the murder that "[y]es. I shot her."

---

**2.** We find no merit in the defendant's remaining assignments of error.

He explained that "she pulled the gun on me. And I turned around and grabbed the gun and put it back in her face, and it went off." Significantly, Detective Sperry testified at trial and was cross examined by the defense. Also, the petitioner's recorded statement was heard by the jury. Therefore, the information was not previously undisclosed or exculpatory in that it simply is a restatement of what the petitioner told Detective Sperry. Finally, the remark in the clinical summary that there was a witness simply refers to Joshua Jackson, who was the only person other than the petitioner and Ms. Smith in the house at the time of Ms. Smith's murder and who testified at trial. In sum, nothing in Dr. Belding's autopsy report or clinical summary made it more or less likely that the petitioner was guilty of an intentional killing.

Further, it is clear from reviewing the trial transcript that the verdict did not hinge on any physical evidence. Neither the State's nor the petitioner's blood splatter experts could rule out an accidental or an intentional killing, and their testimony agreed on material points. Specifically, the two experts agreed that when Ms. Smith was shot, she was looking away from the petitioner. The experts also agreed that based on the blood splatter evidence there is no way that the victim was facing the petitioner at the moment she was shot. However, the petitioner's expert testified that the gun could have hit the victim's face during a struggle and turned her head immediately before the gun fired. The experts also agreed that the victim's arms were up in front of her when she was shot. The State's expert characterized this as a defensive posture whereas the petitioner's expert characterized it as an aggressive posture.

It is apparent to me that the verdict was based on the fact that the jury believed Joshua Jackson's version of events over that of the petitioner. Mr. Jackson, who was in the house at the time of Ms. Smith's murder, testified,

[the petitioner and Ms. Smith] was [sic] arguing and then—I don't know what they was [sic] arguing about, but he said, "I will f‑‑king show you, Bitch." And then he grabbed the gun and walked in there, and I heard the gunshot. And that was it.

Therefore, for the reasons stated above, I believe that the petitioner would have been convicted even if Dr. Belding, the doctor who performed the autopsy, had testified at the petitioner's trial. Accordingly, I respectfully dissent.