# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2016 Term

No. 15-0578

**FILED**

**June 2, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent,**

**V.**

**JESSICA MAY WILSON,**
**Defendant Below, Petitioner.**

Appeal from the Circuit Court of Kanawha County
Honorable Louis H. Bloom, Judge
Criminal Action No. 14-F-228

**AFFIRMED**

Submitted: April 20, 2016
Filed:  June 2, 2016

Charles R. Hamilton
Charleston, West Virginia
Attorney for the Petitioner

Patrick Morrisey
Attorney General
Laura Young
Assistant Attorney General
Zachary Viglianco
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.  "'Cases involving plea agreements allegedly breached by either the prosecution or the circuit court present two separate issues for appellate consideration: one factual and the other legal. First, the factual findings that undergird a circuit court's ultimate determination are reviewed only for clear error. These are the factual questions as to what the terms of the agreement were and what was the conduct of the defendant, prosecution, and the circuit court. If disputed, the factual questions are to be resolved initially by the circuit court, and these factual determinations are reviewed under the clearly erroneous standard. Second, in contrast, the circuit court's articulation and application of legal principles is scrutinized under a less deferential standard. It is a legal question whether specific conduct complained about breached the plea agreement. Therefore, whether the disputed conduct constitutes a breach is a question of law that is reviewed de novo.' Syl. Pt. 1, *State ex rel. Brewer v. Starcher*, 195 W. Va. 185, 465 S.E.2d 185 (1995)." Syllabus point 1, *State v. Shrader*, 234 W. Va. 381, 765 S.E.2d 270 (2014).

**Davis, Justice:**

Jessica May Wilson ("Wilson"), entered a plea of guilty in the Circuit Court of Kanawha County to a charge of murder in the first degree. In exchange for the plea, the State agreed to dismiss numerous related charges against her, including charges of burglary, conspiracy, robbery, and grand larceny. The State also agreed to stand silent at sentencing, although it specifically "reserve[d] the right to cross-examine witnesses offered in mitigation of punishment and to correct any factual inaccuracies which come to the attention of the court or which are contained in the pre-sentence investigation report."

At the sentencing hearing, the State made no recommendation with respect to whether the court should attach a recommendation of mercy to its sentence. However, the prosecutor did dispute Wilson's version of events in certain respects, arguing to the circuit court that she was attempting to minimize her involvement in the crime and to present herself as a hapless victim of her co-defendant, the actual killer. The circuit court, after making clear that it was fully aware of the facts and circumstances of the case and had read all of the relevant reports, imposed a sentence of life imprisonment without mercy. Thereafter, Wilson filed both a motion to reduce sentence and a motion to void the plea agreement, contending that the actions of the prosecutor violated the terms of the plea agreement, specifically, the State's agreement to stand silent at sentencing.[1] The circuit court denied the motions, finding

---

[1]Wilson also alleged that the circuit court had failed to give proper weight to a
(continued...)

1

that the State had not breached the agreement and that, in any event, the prosecutor's statements had not influenced the court's decision.

Upon careful examination of the parties' briefs and oral arguments, the appendix record, and the applicable law, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On or about January 4, 2014, Wilson and her codefendant, Timothy Paul Shafer ("Shafer"), viciously murdered Nancy Lynch-Burdette ("Ms. Lynch-Burdette"). The two had planned in advance to accost Ms. Lynch-Burdette at her home and rob her, considering her to be an "easy mark" because she was sixty-six years old, weighed only one hundred pounds, lived alone, and had been robbed on earlier occasions but had never made a report to the police.

Wilson and Shafer walked to Lynch-Burdette's home, Wilson armed with a knife and Shafer with a toy gun. While Ms. Lynch-Burdette was outside putting her basset hound on a leash, the conspirators forced her (and the dog) inside. They demanded money and drugs, which Ms. Lynch-Burdette did not have. Further, she could not remember the

---

[1](...continued)
variety of mitigating factors offered by her counsel, a claim that is not at issue in this appeal.

correct sequence of numbers in the PIN code for her debit card. This, according to Wilson, caused Shafer to become enraged and, thereafter, although the exact degree of Wilson's participation is somewhat unclear,[2] the conspirators beat and stabbed their victim to death.[3]

After killing Ms. Lynch-Burdette, Wilson and Shafer took items of value from her home, including jewelry, pills, guns, and a camera. They disposed of the knife and toy gun in an area near the victim's home. In the days that followed, Shafer and his girlfriend, Megan Hughes ("Hughes"), and possibly Wilson as well,[4] kept returning to the home to search for more valuables, ultimately including a television, jewelry, checks (which were then written out to Shafer), mail, and the victim's two cars. While they continued to plunder Ms. Lynch-Burdette's home as though it were their personal piggy bank, they wrapped her body in a tarp, presumably so they would not have to look at it as it decomposed.

---

[2]Although Wilson stated, both at her plea hearing and at her sentencing, that it was Shafer, acting alone, who killed Ms. Lynch-Burdette, police statements indicate, variously, that Wilson held the victim while Shafer stabbed her to death; that she took several swings of the knife herself, at Shafer's insistence, but succeeded only in waving the knife around and "glancing" the victim; and that she may have stabbed the victim herself eight or nine times.

[3]An autopsy revealed that Ms. Lynch-Burdette had been stabbed at least nineteen times.

[4]The record is unclear as to whether Wilson ever returned to Ms. Lynch-Burdette's home after the night of the murder. Without question, however, she knew that Shafer and Megan Hughes kept going back to plunder the house.

Finally, some three weeks after the murder, Ms. Lynch-Burdette's body was found after a neighbor reported to police that she had not seen Ms. Lynch-Burdette for a significant period of time. Her dog also was found dead, having been shut in an upstairs portion of the home and left to starve to death.

Acting on a tip from a cooperating individual, the police quickly focused on Wilson, Shafer, and Hughes as suspects in the crime. Wilson gave an initial statement in which she admitted that Shafer had told her of his plan to rob someone and asked her to get rid of some jewelry for him; other than that, Wilson claimed, she had no knowledge or information as to the death of Ms. Lynch-Burdette. In her second statement, however, Wilson gradually admitted more and more about her role in the crime: being with Shafer in the victim's home, holding the victim while Shafer stabbed her, waving the knife around at Shafer's insistence, and finally that "she may have stabbed the victim eight or nine times."[5]

On May 16, 2014, Wilson was arrested and subsequently indicted, together with Shafer, on eight counts including murder, conspiracy, burglary, robbery, and grand larceny. Shafer also was charged, together with Hughes, on three additional counts of daytime burglary; and Hughes was charged as an accessory after the fact to murder.

---

[5]In Shafer's statement, he claimed that Wilson alone had stabbed the victim, after instructing Shafer to "look away."

Thereafter, following extended proceedings involving the question of Wilson's competency,[6] she agreed to plead guilty to first degree murder, in exchange for which the State agreed to dismiss the remaining seven counts against her and "to stand silent as to sentencing, however, the Office of the Prosecuting Attorney does reserve the right to cross-examine witnesses offered in mitigation of punishment and to correct any factual inaccuracies which come to the attention of the court or which are contained in the pre-sentence investigation report."

At a plea hearing held on April 10, 2015, Wilson attempted to minimize her role in the death of Ms. Lynch-Burdette:

> THE COURT: All right. Tell me what happened: who, what, when and where.
>
> THE DEFENDANT: I knew [Shafer] was going over to rob her.
>
> THE COURT: Okay. [Shafer] was going to rob who?
>
> THE DEFENDANT: Nancy Lynch[-Burdette].
>
> THE COURT: Okay. And what did you do about it?
>
> THE DEFENDANT: Nothing. He told me if I say anything, that he'll do the same thing to me.
>
> THE COURT: You were there?

---

[6]Following a six-month period of treatment at Sharpe Hospital, Wilson was deemed competent to stand trial.

THE DEFENDANT: Yes.

. . . .

THE COURT: And what action, if any, did you take specifically?

THE DEFENDANT: He – I don't know. (Thereafter, following a conference between defendant and counsel). Oh, I went into the house with [Shafer], and then –

THE COURT: You guys broke in; you weren't invited in?

THE DEFENDANT: He walked in behind her.

THE COURT: Okay. But you were not invited in?

THE DEFENDANT: Right. And then he started hitting on her, and then he stabbed her.

THE COURT: And you knew the intention was to rob the house; is that correct?

THE DEFENDANT: Right. But I didn't know that he was going to kill her.

The court was satisfied that Wilson's allocution was a sufficient factual basis

for her plea of guilty to felony murder, although the State expressed some qualms:

MR. GIGGENBACH: Well, for the purpose of this plea hearing I believe that's sufficient to establish the elements of felony murder. If this were to go to trial, the State would present different evidence, more inculpatory evidence of the defendant, however.

THE COURT: All right. Well, we'll take that up at the appropriate time at disposition.

Wilson's pattern of minimizing her involvement continued with the submission of her Sentencing Memorandum. Her counsel stated, inter alia, that the only reason she was even present at the scene of the crime was that she was afraid of her codefendant, Shafer; that "[Wilson] did not stab Nancy Lynch[-Burdette]"; that she had obtained none of the proceeds of the robbery, burglary, and grand larceny; and that the only reason she even touched the murder weapon was that "Shafer threw the knife towards [Wilson] and screamed at her to stab the victim. [Wilson] doesn't believe she touched the victim with the knife."

At Wilson's sentencing hearing on May 7, 2015, the pattern continued. Defense counsel first spoke at length about her disadvantaged upbringing, her addiction to drugs, which resulted in the loss of her children, her low IQ and illiteracy, and her passive and submissive personality. Defense counsel then launched into the murder itself, which he described as follows:

> [O]n January 4, Wilson learned that the male guest staying at her house intended to, to go out and to rob somebody of drugs and money. Knowing this, Wilson agreed to accompany this male. She traveled to 2327 Jefferson Avenue in St. Albans. This was her first time ever going to this house, having no idea who lived there, just knowing the intention of her male guest.

> While there, a woman died. And Wilson was scared to death. She left this home and never returned after this January 4th night.

7

As counsel continued in this vein, the court finally interrupted, telling counsel that "you're telling me things that are not supported by anything in the record before me . . . you need to confine yourself to what's in the record . . . [u]nless you want to put on a witness." Counsel declined this opportunity and went on, once again straying into the realm of speculation (as to why the police let Wilson go home even after she had incriminated herself) and once again being admonished by the court to confine his argument to information contained in the record.

Given an opportunity to speak on her own behalf, Wilson again claimed that "I knew [Shafer] was going to rob her, but I didn't know that he was going to kill her. . . ," and "I didn't go back to the house, I didn't step over her body like they did."

Called upon for the State's comment, the prosecutor reminded the court that the plea agreement required the State to stand silent as to sentencing, and therefore "[w]e're not going to say anything about mercy or no mercy." The prosecutor continued that he would, however, correct factual inaccuracies in defense counsel's presentation: "I'm not saying they're intentional – but a sort of whitewashing of the facts." Over Wilson's objection, the court permitted the prosecutor to refer to her earlier admission that she had

stabbed the victim,[7] and further her admission that she had gone back to the victim's house after the murder to get the victim's car.

Following a victim impact statement from Ms. Lynch-Burdette's cousin, Judy Clary, the court issued its judgment. Initially, the circuit court noted that it previously had reviewed the statements to which the prosecutor had referred:

> I can't imagine, whichever version we're to believe from you, that you stood by and idly watched someone stab another human being 19 times, left them there to bleed out without contacting anybody to provide any help or first aid, allowing them to bleed to death in a slow and miserable manner, or whether you actively participated by stabbing as you indicated in the stab – in the statements that you [gave]. Neither way is defensible.

Additionally, the court found Wilson's mitigating factors to be unconvincing, as the record indicated that many of her problems were aggravated by her use of drugs and alcohol. Although noting that she had only one prior offense on her criminal record, the court stated that "you were continually violating the law and hurting those around you. I don't find that your conduct in this matter in any way . . . makes you eligible for life with mercy."[8] The

---

[7]According to the prosecutor,

> she stated to Detective Elkins with the St. Albans Police Department – we have it on video. If you look at Dr. Smith's report, it states it as well. That she admitted to stabbing four to five times. And I could cue it up and show you "three or four times" once she says and then "one to two more."

[8]The court earlier had alluded to the Pre-Sentence Investigation Report, which
(continued...)

court's sentencing order, imposing a sentence of life without mercy, was entered the following day, May 8, 2015.

Thereafter, on June 23, 2015, Wilson filed a motion to reduce sentence and a motion to void her plea, asserting that the prosecutor's statements at sentencing violated the State's agreement to stand silent. By separate order entered on July 30, 2015, the court denied the motion, finding first that, under the plea agreement, the prosecutor was entitled to correct factual errors, and finding further that, in any event, it "[didn't believe that the State [had] evidenced any argument that I had not already concluded from my complete, thorough evaluation of all facts and circumstances available to the Court in reaching an appropriate sentence in the case." From these adverse rulings, Wilson appeals to this Court.

## II.

## STANDARD OF REVIEW

It is well established in this Court's precedents that,

"[c]ases involving plea agreements allegedly breached by either the prosecution or the circuit court present two separate

---

[8](...continued)
contained information that Wilson was a high Level of Service/Case Management Inventory ("LS/CMI") risk level, and further that she "accepted no responsibility for the crime [of] which she has been convicted and expressed little remorse . . . [and] shows little regard for human life." The LS/CMI is an assessment system that measures and offender's risk and need factors for purposes such as sentencing.

issues for appellate consideration: one factual and the other legal. First, the factual findings that undergird a circuit court's ultimate determination are reviewed only for clear error. These are the factual questions as to what the terms of the agreement were and what was the conduct of the defendant, prosecution, and the circuit court. If disputed, the factual questions are to be resolved initially by the circuit court, and these factual determinations are reviewed under the clearly erroneous standard. Second, in contrast, the circuit court's articulation and application of legal principles is scrutinized under a less deferential standard. It is a legal question whether specific conduct complained about breached the plea agreement. Therefore, whether the disputed conduct constitutes a breach is a question of law that is reviewed de novo." Syl. Pt. 1, *State ex rel. Brewer v. Starcher*, 195 W. Va. 185, 465 S.E.2d 185 (1995).

Syl. pt. 1, *State v. Shrader*, 234 W. Va. 381, 765 S.E.2d 270 (2014).

## III.

## DISCUSSION

In this Court's recent decision in *Buffey v. Ballard*, 236 W. Va. 509, 782 S.E.2d 204 (2015), we noted that the vast majority of criminal cases are resolved as a result of guilty pleas "'[i]n today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.'" *Id.*, 236 W. Va. at ___, 782 S.E.2d at 212 (quoting *Missouri v. Frye*, ___ U.S. ___, ___, 132 S. Ct. 1399, 1407, 182 L. Ed. 2d 379 (2012). Consistent with this acknowledgement, we have long recognized that "[a]s a matter of criminal jurisprudence, a plea agreement is subject to principles of contract law insofar as its application insures a defendant receives that to which

he is reasonably entitled." *State ex rel. Brewer v. Starcher*, 195 W. Va. 185, 192, 465 S.E.2d 185, 192. *Accord State v. Spade*, 225 W. Va. 649, 695 S.E.2d 879 (2010). Because "[d]ue process concerns arise in the process of enforcing a plea agreement. . .," *State v. Myers*, 204 W. Va. 449, 457, 513 S.E.2d 676, 684 (1998), "[p]ermitting the prosecution to breach a plea bargaining agreement has been characterized as 'extremely detrimental to the administration of justice if it should be established.'" *State v. Spade*, 225 W. Va. at 659, 695 S.E.2d at 889 (quoting *State ex rel. Gray v. MClure*, 161 W. Va. 488, 491, 242 S.E.2d 704, 706 (1978)).

Any ambiguities in a plea agreement will be construed against the State. Syl. pt. 3, in part, *State ex rel. Thompson v. Pomponio*, 233 W. Va. 212, 757 S.E.2d 636 (2014) (rejecting State's argument that language of plea agreement was ambiguous, and holding that any ambiguity must be construed against State). Nevertheless, a plea agreement should be read reasonably, without resort to strained or hyper-technical intrpretatio. *See United States v. Larson*, 78 Fed. Appx. 650, 655-56 (10th Cir. 2003); *United States v. Little*, 14 Fed. Appx. 200, 204 (4th Cir. 2001).

With these legal principles in mind, we examine the specific language of the plea agreement at issue in this case:

> The Office of the Prosecuting Attorney agrees to stand silent as to sentencing, however, the Office of the Prosecuting Attorney does reserve the right to cross-examine witnesses offered in mitigation of punishment and to correct any factual

12

inaccuracies which come to the attention of the court or which are contained in the pre-sentence investigation. The State, however, reserves the right to comment at any post-sentencing hearings.

This language is straightforward and unambiguous.[9] Given Wilson's guilty plea to first degree murder, there were two possible sentences the court could have imposed: life with mercy and life without mercy.[10] The State agreed to not take a position on this issue and indeed did not take a position. This situation is decidedly different from cases in which this Court has found that a plea agreement has been violated. *See, e.g.*, *State v. Martin*, 225 W. Va. 408, 693 S.E.2d 482 (2010) (concluding plea agreement was breached when, after agreeing to make a non-binding recommendation of probation, prosecutor stated at sentencing "I find it hard to believe . . . that Mr. Martin could comply with the terms and conditions of probation. I ask that the court deny any motion for probation or other alternative sentence"); *State v. Myers*, 204 W. Va. 449, 513 S.E.2d 676 (finding prosecutor breached plea agreement by urging court to sentence defendant to life in prison without mercy, and take into account that crime was committed with use of firearm, despite the State's specific agreement to remain silent on these issues).

---

[9]*See generally* Syl. pt. 2, *Citynet, LLC v. Toney*, 235 W. Va. 79, 772 S.E.2d 36, 38 (2015) ("'Where the terms of a contract are clear and unambiguous, they must be applied and not construed.' Syllabus point 2, *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969).").

[10]No one, including Wilson, seems to have even contemplated the possibility that the court would grant parole.

13

Wilson argues that, although the prosecutor did not specifically say "don't grant mercy," logic compels the conclusion that, by arguing Wilson was more culpable in the crime than she was admitting, that is exactly what the prosecutor was urging the court to do. We disagree. The State had not promised in the plea agreement to stand silent; it had promised only to stand silent as to sentencing. *See United States v. Hawkins*, 675 F. Supp. 2d 617, 619 (E.D. Va. 2009) (commenting that "[t]he starting point in the analysis is, of course, the plain language of the plea provision at issue."). The State had specifically reserved the right to "correct any factual inaccuracies which come to the attention of the court. . .," and factual inaccuracies filled the air at the sentencing hearing as defense counsel reduced the horrific death of Nancy Lynch-Burdette to the words, "[w]hile there, a woman died." When defense counsel was through with his lengthy remarks, the prosecutor made reference to specific evidence of record: Wilson's admissions to police that she herself had stabbed the victim and that she had returned to the house at some time after the killing. The prosecutor's remarks were brief; indeed, much of what he had to say came in response to the circuit court's specific questions about what was shown in the autopsy report.[11]

---

[11]As was apparent when the court imposed sentence, one factor that significantly influenced its decision was the fact that the victim had been stabbed nineteen times. Even accepting Wilson's version of events, the court stated, "you stood by and idly watched someone stab another human being 19 times, left them there to bleed out without contacting anybody to provide any help or first aid, allowing them to bleed to death in a slow and miserable manner."

Additionally, a close review of the record in this case compels the conclusion that there is "no reasonable possibility that the [alleged] violation contributed to the [sentence imposed by the court.]" Syl. pt. 2, in part, *State v. Frazier*, 229 W. Va. 724, 735 S.E.2d 727 (2012). To the contrary, it is clear from a review of the sentencing transcript that the factual inaccuracies addressed by the prosecutor already were known to the circuit court, which had admonished defense counsel several times to stick to the facts of record or call a witness, and who demonstrated a comprehensive familiarity with the police reports, the psychiatric reports, and the pre-sentence report.[12] The circuit court specifically stated that, regardless of whether Wilson had stabbed the victim herself or stood by watching as Shafer did it, "neither way is defensible." The circuit court found her grounds for mitigation to be self-serving and unavailing, specifically noting that Wilson's use and abuse of drugs and alcohol had resulted in her losing her children, and concluding that "I don't find that your conduct in this matter in any way near makes you eligible for life with mercy."

At the hearing on Wilson's post-trial motion to void her plea, the circuit court reviewed the prior proceedings and the arguments of counsel, and concluded that:

> [s]o I can honestly say that the State's comments, even if I didn't find that . . . they were entitled to come forth with [a] response to correct the factual errors in the case, . . . I don't believe that the State [has] evidenced any argument that I had

---

[12]The court had also reviewed the statement of Wilson's codefendant, Shafer, who claimed that Wilson alone killed the victim.

15

not already concluded from my complete, thorough evaluation of all facts and circumstances available to th Court in reaching an appropriate sentence in the case.

Even if I were to completely disregard everything that the prosecution said, I would have come to the same conclusion based on all the information available to the Court at the time of sentencing.

In summary, the State did not breach its agreement to remain silent as to sentencing, there were no improper factors considered in the court's sentencing decision, and the sentence imposed was well within the court's discretion and amply justified under the facts and circumstances of this case. *See* Syl. pt. 1, in part, *State v. Lucas*, 201 W. Va. 271, 496 S.E.2d 221 (1997) ("The Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands.").

## IV.

## CONCLUSION

We affirm the judgment of the Circuit Court of Kanawha County, sentencing Wilson to life imprisonment without mercy upon her plea of guilty to first degree murder. Accordingly, we affirm the May 8, 2015, and July 30, 2015, orders of the Circuit Court of Kanawha County.

Affirmed.