# CHARLESTON.

STATE *v.* WILLIAM GORDON NEWMAN

(No. 6643)

Submitted February 18, 1930.   Decided February 25, 1930.

*Daugherty & Daugherty,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

William Gordon Newman confessed to the crime of robbery, being armed with a deadly weapon, and on November 15, 1928, was sentenced to the penitentiary for twenty-five years; and he prosecutes error on the ground that the court's sentence was unreasonable and unconstitutional.

Robert Henry Jackson, a boy of nineteen years, was in charge of a filling station in the city of Huntington, and at about eleven o'clock on the night of September 6, 1928; was robbed of $37.03 by Newman and his companion in crime, Clarence Thomas Kirtley, the latter being armed with a revolver. Newman was 32 years of age and was a resident of Alta Vista, Virginia; Kirtley was 26 years of age and resided at Roanoke, Virginia. Several months before the robbery they met, became acquainted, and about two weeks before the date

644

of the robbery left Roanoke together in a Chevrolet sedan car owned by Newman's father. It does not appear what their journeyings were during the two weeks of absence from Roanoke, but several days before the robbery they arrived in Huntington and became guests of the Florentine Hotel. Newman owned a pistol which they brought with them. On the night of the robbery they drove their car to a speakeasy, or some similar institution operated by a negress, with the purpose of impersonating prohibition officers and arresting the occupants of the house, and releasing them for money. They were not successful in this attempt, but did get a small quantity of moonshine liquor. Then they entered the car and drove around the city, Kirtley stating that they were looking for likely places to hold up and rob of money. They came to Jackson's place about eleven o'clock that night; and on observing someone else besides the attendant at the station drove around the square until that other person left, and then drove into the filling station and requested gas for the car and that the oil be changed, stating that they had driven it for about one thousand miles without a change of oil. The car was driven over the pit. Jackson went into the pit, drained the oil, and then attempted to put fresh oil in the car, but the cap over the receiving tube was refractory. He then went back down into the pit, where there was a small room in the concrete with an iron door thereto which contained tools, to get a wrench to remove the cap. As he came back towards the car, Kirtley pointed a pistol at him and demanded and took from him his money, which consisted of silver and bills. Kirtley handed the silver money to Newman who put it in his pocket, and kept the bills himself. The question then arose as to what they should do with Jackson. They asked him if he had observed the make of the car and he told them that it was a Chevrolet sedan; they then asked him if he knew their license tag and he said that he did not, although he had observed that it was a Virginia license on the car. According to Kirtley and Jackson, Newman then directed that he be put in the cell and locked up. Jackson plead with them not to put him in that place because he would suffocate therein before morning, and requested that he be allowed to remain

on the steps of the pit until they made their escape. Upon the insistence of Newman he was put into the cell, secretly taking the lock off the door and carrying it into the cell. When he was in, they placed a screwdriver so as to keep the door closed and prevent him from getting out. They then hurriedly filled their car with oil and drove away, taking with them a pair of pliers which Jackson had left in the car. Sometime afterward, Jackson attracted the attention of boys who were passing on the street and they removed the screwdriver. He then called his employer and police and gave them the details of the robbery. The car was soon located in a garage and identified by means of the make of car, the license plate, and Jackson's pliers. The two men were afterward found in the hotel in separate rooms each with a woman, and the money was recovered. Having elected to have a separate trial, Kirtley voluntarily became a witness for the state at Newman's trial and made a clean breast of the whole matter. Newman then went upon the stand and gave his version of the affair, which, in the main, was that given by Kirtley and Jackson, but laid the entire blame upon Kirtley. He said Kirtley was the leading actor in the whole matter. He denied that he had insisted that Jackson be placed in the cell with the iron door. Realizing the futility of further defense, at the conclusion of Newman's testimony, he asked permission to withdraw his plea of not guilty and enter a plea of guilty, which the court allowed to be done, and then promptly sentenced him to 25 years' confinement in the penitentiary. There was another indictment returned against Kirtley and Newman jointly for grand larceny. On December 6, 1928, several weeks after Newman's trial, Kirtley was arraigned on this charge and plead guilty thereto and the court sentenced him to the penitentiary for three years for grand larceny. On the same day, the indictment for robbery on which Newman was tried separately (which indictment was a joint one against Newman and Kirtley) was nollied by the State, thus relieving Kirtley from prosecution for robbery with a deadly weapon. How the orders relating to Kirtley's sentence for grand larceny and the indictment nollied as to Kirtley got in the record before us does not appear. They were not made a

part of any bill of exceptions or of any other proceedings in which Newman was interested after his trial was had. However, they are here. Application was later made to the circuit court for a writ of error to the judgment of the Court of Common Pleas, which was refused, the order stating that in the circuit court's judgment the conviction in the Common Pleas Court was plainly right.

Article 3, sec. 5 of our constitution prohibits the imposition of cruel and unusual punishments, and says that, ''Penalties shall be proportioned to the character and degree of the offense.'' Imprisonment for robbery is not a cruel and unusual punishment. The constitution prohibits imposition of punishment which amounts to torture, such as drawing, quartering, burning at the stake, mutilation, starving to death, boiling to death, and other similar punishments which were imposed under old English laws, and which now shock the consciences of christian people. *State* v. *Woodward,* 68 W. Va. 66. It was expressly held in *Franklin and Ponto* v. *Brown, Warden,* 73 W. Va. 727, that the statute imposing a term of imprisonment of not less than ten years and without a maximum limit upon one who commits robbery, being armed with a dangerous weapon, is not in contravention of section 5, Article 3 of the Constitution relating to cruel and unusual punishments, and that penalties shall be proportioned to the character and degree of the offense. We approve that decision. In that case, an imprisonment for life was imposed for robbery where no dangerous weapon had been used, or at least had not been charged in the indictment; and it was there pointed out that robbery has always been regarded as a crime of the gravest character, and the punishment therefor in England today is imprisonment for life at penal servitude. That case was one on *habeas corpus,* and the only question the court considered was whether the prisoner was illegally detained, the full record of the trial not being before it.

The statute (Code, c. 144, § 12) being without limit in maximum imprisonment and not in contravention of the constitution on that ground, neither as to cruel and unusual punishment, nor as disproportionate to the character and degree of the offense of robbery by use of a deadly weapon,

the only question which is here raised is whether the trial court under the facts and circumstances shown in this record has abused its discretion in sentencing the prisoner to confinement for 25 years. The court's discretion to punish runs between a term of ten years and life in cases of this character. Has that discretion been abused in view of the constitution which says that penalties shall be proportionate to the character and degree of the offense? Where an inferior court is given discretion, the appellate court will not interfere with its exercise unless there is a clear abuse. Can we say there was a clear abuse of that discretion, and that an excessive and disproportionate sentence has been imposed? While Kirtley was not convicted of robbery (having confessed to grand larceny and the robbery indictment against him nollied), he was clearly guilty of that crime. He admitted his guilt in Newman's trial, and it is not apparent why he should have been allowed to escape a just retribution. The maximum for that crime is ten years. His evidence was not necessary to a conviction of Newman, but of course it made his guilt so apparent that Newman withdrew his defense and plead guilty. It would not be clear to the mind of the layman what impelled the difference in punishment of two persons each equally guilty. While the sentence of Kirtley for larceny has no bearing on the severity of the punishment given Newman, the fact that Kirtley escaped the charge of robbery of which he was clearly guilty, beclouds the justness of the severer punishment upon his companion in that crime. The primary object to punishment is retributory justice, and unless such justice be shown in the sentence of the court it is not likely to deter others from committing crime nor to reform the person sentenced. An excessive punishment, instead of being a deterrent, often results in the generation of an angry public contempt of justice because of its severity, and does not reform the criminal who perceives injustice towards himself. The best course for the courts is to adapt the duration of the punishment to the prisoner's guilt, keeping in view his character and susceptibility to reformation as an ingredient. 1 Kerr's Whart. Crim. Laws, secs. 12, 22. These general observations are here made be-

cause some of our courts too often impose such severe and excessive punishments as are calculated to bring the administration of justice into public disfavor.

But, can we say the sentence here given is excessive and that the court has abused its discretion? Viewing the case from what the record shows, it is likely that this court would have pronounced a lesser term of imprisonment. However, it must be remembered that the demeanor and conduct of the prisoner are not truly reflected by a cold written record. Robbery of those in charge of filling stations seems to be prevalent. There is nothing especially vicious in this robbery, except the controverted fact that Newman insisted in confining Jackson in the cell which might have caused the suffocation of the latter. On the whole, we cannot say the court has clearly abused its discretion. In eight or nine years the convict will be eligible to parole if he is a good prisoner, and in the meantime executive clemency may be invoked to remedy any miscarriage of justice.

*Affirmed.*