IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

**FILED**
**March 9, 2017**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-0044

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

ANTWYN D. GIBBS,
Defendant Below, Petitioner

Appeal from the Circuit Court of Fayette County
Honorable Paul M. Blake, Jr., Judge
Criminal Action No. 15-F-64

AFFIRMED

AND

No. 15-1193

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

KEVIN GOODMAN, JR.,
Defendant Below, Petitioner

Appeal from the Circuit Court of Fayette County
Honorable Paul M. Blake, Jr., Judge
Criminal Action No. 15-F-66

AFFIRMED

Submitted:  February 7, 2017
Filed:  March 9, 2017

Steven K. Mancini, Esq.
Beckley, West Virginia
Counsel for the Petitioner
Antwyn D. Gibbs

Brian D. Parsons, Esq.
Chief Assistant Prosecuting Attorney
Fayette County
Fayetteville, West Virginia
Counsel for the Respondent

Crystal Walden, Esq.
Director Appellate Advocacy Division
Public Defender Services
Charleston, West Virginia
Counsel for the Petitioner
Kevin Goodman, Jr.

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.  When an accused, who is being tried jointly for a felony offense with co-defendants, seeks to avoid the sharing of six peremptory challenges, as provided under West Virginia Code § 62-3-8 (2014), he or she must file a motion expressly requesting additional peremptory challenges in accordance with Rule 24(b)(2) of the West Virginia Rules of Criminal Procedure.  The trial court's ruling on a Rule 24(b)(2) motion shall be at its sole discretion.

2.  "This Court will not reverse a denial of a motion to sever properly joined defendants unless the [petitioner] demonstrates an abuse of discretion resulting in clear prejudice."  Syl. Pt. 3, *State v. Boyd*, Nos. 15-0878 and 15-0894, __ W.Va. __, __ S.E.2d __, 2017 WL 372177 (Jan. 19, 2017).

3.  "A trial court should grant a severance under Rule 14(b) of the West Virginia Rules of Criminal Procedure only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."  Syl. Pt. 5, *State v. Boyd*, Nos. 15-0878 and 15-0894, __ W.Va. __, __ S.E.2d __, 2017 WL 372177 (Jan. 19, 2017).

4.  "A defendant is not entitled to relief from prejudicial joinder pursuant to

i

Rule 14 of the West Virginia Rules of Criminal Procedure[] when evidence of each of the crimes charged would be admissible in a separate trial for the other." Syl. Pt. 2, *State v. Milburn*, 204 W.Va. 203, 511 S.E.2d 828 (1998).

5. "'A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998)." Syl. Pt. 1, *State v. Timothy C.*, 237 W.Va. 435, 787 S.E.2d 888 (2016).

6. "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity, thereby violating West Virginia Constitution, Article III, Section 5 that prohibits a penalty that is not proportionate to the character and degree of an offense." Syl. Pt. 5, *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983).

7. "'In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a

comparison with other offenses within the same jurisdiction.' Syllabus point 5, *Wanstreet*

*v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981)." Syl. Pt. 2, *State v. Adams*, 211

W.Va. 231, 565 S.E.2d 353 (2002).

LOUGHRY, Chief Justice:

Through these consolidated appeals, the petitioners, Antwyn D. Gibbs and Kevin Goodman, Jr., each seek a reversal of their convictions and sentencing from final orders entered by the Circuit Court of Fayette County. Following a joint jury trial, the petitioners were convicted of first degree robbery in violation of West Virginia Code § 61-2-12(a) (2014), entry of a dwelling in violation of West Virginia Code § 61-3-11(b) (2014), and conspiracy to commit a felony in violation of West Virginia Code § 61-10-31 (2014). Both were sentenced to consecutive terms of incarceration of one to five years for conspiracy, which was enhanced to two to five years for petitioner Gibbs pursuant to a recidivist conviction;[1] one to ten years for entry of a dwelling; and fifty years for first degree robbery. Petitioner Gibbs challenges the sufficiency of the evidence to convict him of first degree robbery. Petitioner Goodman challenges (1) the proportionality of his sentencing, and (2) the trial court's denial of his motion to sever his trial, which he asserts resulted in the admission of irrelevant and prejudicial evidence. Both Gibbs and Goodman maintain that the trial court abused its discretion in denying their respective motions to sever their trials without addressing one of several bases for their motions: that they did not want the six peremptory jury challenges to which each would be entitled if tried separately to be reduced through sharing those challenges in a joint trial. Following a careful review of the briefs, the

---

[1]*See infra* note 23.

1

arguments of counsel, the appendix record submitted, and the applicable law, this Court finds no reversible error and affirms the petitioners' convictions and sentencing.

## I. Facts and Procedural Background[2]

On May 12, 2015, a Fayette County grand jury returned an indictment jointly charging Kevin Goodman, Jr., Antwyn Gibbs, Radee Hill, Kentrell Goodman,[3] and Rashod Wicker[4] with the felony offenses of first degree robbery, entry of a dwelling, grand larceny, and conspiracy to commit these felonies. Kentrell G. and Wicker entered into plea agreements with the State pursuant to which each pled guilty to first degree robbery with all remaining charges being dismissed.[5]

---

[2]The facts and procedural background as set forth herein have been gleaned from the appendix record, including hearing and trial transcripts.

[3]For purposes of this opinion, petitioner Kevin Goodman, Jr., will be referred to individually as either "petitioner Goodman" or "Goodman;" Kentrell Goodman will be referred to as "Kentrell G.;" and jointly they will be referred to as "the Goodmans."

[4]Trial testimony revealed that all of these men knew each other prior to the instant criminal conduct. Hill grew up with Gibbs; the Goodmans are brothers; Wicker and the Goodmans are cousins; and petitioner Goodman dated Hill's cousin.

[5]Their respective plea agreements provided that the State would recommend youthful offender treatment under West Virginia Code §§ 25-4-1 to -12 (2013). Although not required under their plea agreements, Kentrell G. and Wicker each agreed to testify for the State at the trial of their co-defendants.

Prior to trial, the petitioners and Hill each filed a motion under Rule 14(b) of the West Virginia Rules of Criminal Procedure seeking to sever his trial from that of his co-defendants. Following hearings on these motions, and through its order entered on August 31, 2015, the trial court denied all motions to sever.

The three-day joint trial of the petitioners and Hill began on September 9, 2015. The State's evidence included the testimony of eleven witnesses and numerous exhibits, including physical evidence of the crimes. Each of the defendants testified in his own defense, denying any culpability in the crimes, and petitioner Goodman also presented the testimony of an alibi witness.

The evidence at trial revealed that between midnight and 1:00 a.m. on January 9, 2015, Hill, Wicker, Kentrell G., and the petitioners departed South Carolina, traveling to Oak Hill, West Virginia, for the purpose of robbing Andrew Gunn. Kentrell G., who grew up in Oak Hill, was close friends with Gunn and knew that Gunn kept a safe containing approximately $10,000 in his bedroom in the home of his grandparents, Linda and Edward[6] Knight. Kentrell G. conveyed this information to his brother, petitioner Goodman, who responded, "Let's go get money." The men traveled to Oak Hill in a car belonging to

---

[6]Mrs. Knight testified that her husband's name was "Elwood" but that he goes by the name "Charles." Mr. Knight testified that his name is "Edward."

Kentrell G.'s girlfriend, Lindsey Hess. Wicker, who was the sole person in the group with a valid driver's license, was the driver.

Upon their arrival in Oak Hill around 7:30 or 8:00 a.m. on January 9, 2015, Wicker parked the car near a wooded area fifty to sixty feet from the Knights' residence. Wicker, who has cerebral palsy, remained with the car. Mrs. Knight testified that she had let her dogs outside earlier that morning but had not fully closed the door to her home when she brought them back inside. Then, as she was sitting on the couch getting ready to do her granddaughter's hair for school,[7] she happened to look over and saw a rifle or shotgun easing into her home through the door. Thereafter, four men, who had the majority of their faces covered but who appeared to be black,[8] entered her home. According to Mrs. Knight, in addition to one man having a "long gun," another man had a pistol. Andrew Gunn described these weapons as a .38 special and a 12-gauge shotgun during his testimony.

Although Mrs. Knight was "really scared" for herself and her grandchildren, she refused to get on her knees as one of the men told her to do and, instead, remained seated

---

[7]The perpetrators apparently thought there would either be no one or very few persons in the Knight home that morning; however, they were unaware that there was a school delay due to snow. There was also a delay in the start of the Day Report Center, where Andrew Gunn would otherwise have been at that time, as part of his home incarceration.

[8]The record reflects that all five co-defendants are black.

4

on the couch.[9]  Her eighteen-year-old disabled grandson got on his knees and laid his head in her lap as he cried, while her five-year-old granddaughter was "squashed down" behind her on the couch, so afraid that she urinated on herself.  When Mrs. Knight asked the men if she could get a heart pill because she was having chest pain, the man with the long gun told her "no."[10]

Trial testimony revealed that two of the four men went immediately to Gunn's bedroom, while the two armed men remained in the front of the home.  Gunn made an in-court identification of petitioner Goodman as one of the men in the front of the house.  Gunn further described that from his seated position in the living room, he looked down the hallway to his bedroom, where he observed two men[11] throw his crossbow, two pairs of his athletic shoes, and his safe containing approximately $10,000 out of his bedroom window

---

[9]Mrs. Knight testified that she was unable to get on her knees due to arthritis and a sciatic nerve problem.

[10]Mr. Knight testified similarly regarding the morning in question.  As he came out of his bedroom to get a cup of coffee, he saw a shotgun and a handgun pointed at him by men with "cowboy masks" covering their faces.  He stated that when the men told him to get on the floor, he felt like his heart stopped, but replied that he only got on the floor for the Lord.  He then returned to his bedroom where he heard men going through Gunn's adjacent bedroom.

[11]When asked for the names of the two men who were in his bedroom, Gunn replied: "I don't - - I don't remember names very well."

5

to Kentrell G.[12]  After being in the Knights' home approximately fifteen minutes, the perpetrators fled.  Mrs. Knight immediately telephoned the Oak Hill police and reported the crime.

Oak Hill police officers responded to the scene and interviewed those present. Soon thereafter, the officers received a tip that the Goodmans were possibly involved in the robbery and that they lived in or near Newberry, South Carolina.[13]  Two Oak Hill police officers then traveled to South Carolina where search warrants were obtained through the assistance of local law enforcement officers.  In executing the warrants, the officers searched the residence of Benita Wicker,[14] who is co-defendant Rashod Wicker's mother and the Goodmans' paternal aunt.  At that time, Kentrell G. and his girlfriend, Lindsey Hess, were residing in Ms. Wicker's home; petitioner Goodman frequently stayed there, sleeping on the living room couch; and Rashod Wicker also lived there.  The officers recovered Gunn's crossbow and athletic shoes from inside Ms. Wicker's home, and his safe was found in Ms.

---

[12]Gunn testified that Kentrell G. was his "buddy" with whom he had grown up; that he did not "want to be here [testifying at trial]"; and that he "just want[ed] [][his] stuff back." Gunn's testimony that Kentrell G. was outside the Knights' home, while four men were inside it, is inconsistent with all other testimony at trial, but for that of Kentrell G., who also testified that he remained outside the Knights' home.

[13]It appears from testimony at trial that this information was received from the Goodmans' mother, who was concerned that if her sons continued to engage in criminal conduct, either or both would be hurt or killed.

[14]Ms. Wicker's home was located in Little Mountain, South Carolina.  Her home is referred to in the record as "Aunt Benita's" and as "Boyd's Place."

Wicker's yard. These items were admitted into evidence at trial through the testimony of Garrett Lominack, Lieutenant of Investigations for the Newberry County Sheriff's Office in Newberry, South Carolina, and were identified by other witnesses, including Mrs. Knight and Gunn, as the items that had been stolen. The State also presented the testimony of other law enforcement officers concerning the results of their criminal investigation in this matter, including the statements given by Kentrell G. and Rashod Wicker in which they implicated themselves, Hill, and the petitioners in the robbery.[15]

During Kentrell G.'s trial testimony, he described the manner in which the decision was made to travel to West Virginia to steal the money in Gunn's safe; how he and his brother, petitioner Goodman, decided to use Ms. Hess's vehicle for that purpose; how the other men became involved; and how they went about executing the robbery. He testified that Gibbs was carrying the shotgun as the men approached the Knights' residence; that Gibbs and Hill were the first to enter the Knights' residence; and that he remained outside the residence, pointing the other men to the window of Gunn's bedroom where the safe was located.[16] He identified the safe, crossbow, and athletic shoes as the items that were stolen from the Knights' residence and stated that he carried the crossbow and athletic shoes to the car where Wicker was waiting, while the petitioners carried the safe. Kentrell G. further

_____

[15]Other incriminating evidence at trial included cell phones, cell phone communication records, guns, and spent and unspent ammunition.

[16]*See supra* note 12.

testified that after the stolen items and the weapons were placed into the trunk of the car, he and the other men got into the car, and they returned to South Carolina that same day.

Kentrell G.'s girlfriend, Ms. Hess, testified that while she, Kentrell G., and petitioner Goodman were all in Aunt Benita's house during the evening of January 8, 2015, she overheard Kentrell G. and petitioner Goodman planning to rob Andrew Gunn and heard petitioner Goodman tell Kentrell G. that he could get guns and knew people who could help. Later, during the early hours of January 9, 2015, Ms. Hess realized her car was gone from the Wicker residence. Ms. Hess also confirmed the text messages she exchanged with petitioner Goodman's girlfriend, Courtney Curry, around 1:00 a.m. on January 9, 2015. Ms. Curry texted, inquiring as to petitioner Goodman's whereabouts. Ms. Hess texted a reply that petitioner Goodman was in West Virginia. Sometime around midday on January 9, 2015, Ms. Hess saw that her car, Kentrell G., petitioner Goodman, Wicker, and Gunn's safe were all at Ms Wicker's house. Ms. Hess testified that a day or two later, petitioner Goodman purchased a carseat for Kentrell G.,[17] and a television and gaming system were purchased for the bedroom she shared with Kentrell G. in Ms. Wicker's home.[18]

---

[17]Ms. Hess was pregnant at the time with Kentrell G.'s baby.

[18]It is unclear from the appendix record whether Kentrell G. or petitioner Goodman purchased these items.

Rashod Wicker's testimony was consistent with that given by other State's witnesses. He testified that Kentrell G. told him that because he had a driver's license, they needed him to drive them to West Virginia to get some money and that they would be using Ms. Hess's car. He described how he, Kentrell G., Hill, and the petitioners traveled to Oak Hill and where he parked the car in relation to the Knights' residence. He further described seeing petitioner Gibbs retrieve a long gun from the trunk of the car,[19] after which the petitioners, Kentrell G., and Hill headed into the woods towards the Knights' residence. Approximately fifteen minutes later, Wicker saw all four men running back towards the car, with petitioner Goodman carrying the safe and Kentrell G. carrying the crossbow and athletic shoes, all of which were thrown into the trunk.

Evidence at trial demonstrated that upon their return to South Carolina that same day, Wicker was dropped off at the home of his mother, Ms. Wicker. Kentrell G. testified that he and the other men then drove to Gibbs's residence where the safe was opened in the backyard by petitioner Goodman firing a shotgun at the lock.[20] The men divided the

---

[19]Wicker testified that he did not see a handgun.

[20]An expert for the State testified at trial that pieces of plastic recovered by law enforcement from the yard of Gibbs' residence were matched to the safe recovered at Ms. Wicker's residence.

9

cash taken from the safe[21] and then placed the safe back into the trunk of Ms. Hess's vehicle, which the Goodmans drove to Ms. Wicker's home.

The petitioners and Hill each testified in their own defense, denying any involvement in the crimes. Petitioner Goodman also presented the testimony of an alibi witness, Courtney Curry, who stated that Goodman was with her in South Carolina, as early as 8:30 a.m. on January 9, 2015.

At the conclusion of all the evidence, the jury returned its verdict finding Gibbs, Goodman, and Hill guilty of first degree robbery, entry of a dwelling, and conspiracy.[22] All three co-defendants were sentenced to terms of incarceration of one to five years for conspiracy, which was enhanced to two to five years for Gibbs in light of his recidivist conviction;[23] one to ten years for the entry of a dwelling; and fifty years for first

[21]Wicker testified that although he was not present when the cash was divided at petitioner Gibbs's residence, Kentrell G. later gave him $2,000, half of which he then gave to his mother.

[22]The grand larceny charge was dismissed against each defendant on the State's motion during trial.

[23]The State filed a recidivist information against Gibbs. He proceeded to trial on the information, and the jury returned a verdict finding Gibbs had been previously convicted of robbery in South Carolina.

10

degree robbery. The sentences were ordered to be served consecutively. The instant appeals followed.[24]

## II.  Standard of Review

The petitioners have asserted various assignments of error that require different standards of review. Accordingly, we will set forth those standards within our discussion of each issue as we proceed to determine whether the petitioners are entitled to relief from their convictions.

## III.  Discussion

These appeals were consolidated for appellate review because they arise out of the same criminal conduct. We will address the assignments of error raised by the petitioners, in turn, below.

## A.  Denial of Motions to Sever and Peremptory Challenges

The petitioners both assert that the trial court abused its discretion in denying their motions to sever their trials without addressing one of the bases in their motions: that

---

[24]Co-defendant Radee Hill's conviction and sentencing were affirmed in *State v. Hill*, No. 16-0138, 2016 WL 6678997 (W.Va. Nov. 14, 2016) (memorandum decision).

they did not want a reduction in the six peremptory challenges[25] to which they would each

be entitled if tried separately.[26]  The petitioners assert "per se" prejudice in this regard,

adding that a trial court has discretion to allow additional peremptory challenges under West

Virginia Rule of Criminal Procedure 24(b)(2)(B).  They argue that the trial court's failure to

address peremptory challenges in denying their motions to sever was itself an abuse of

discretion.  The State responds that the trial court did not abuse its discretion and took the

appropriate factors into consideration in denying the motions to sever.

A criminal defendant's use of peremptory challenges in a joint trial is governed

by West Virginia Code § 62-3-8 (2014), which provides, in part, as follows:

> Persons indicted and tried jointly, for a felony, shall be allowed to strike from the panel of jurors not more than six thereof, and only such as they all agree upon shall be stricken therefrom; and if they cannot agree upon the names to be so stricken off, the prosecuting attorney shall strike therefrom a sufficient number of names to reduce the panel to twelve.

As this statute makes clear, defendants who are tried jointly share a total of six peremptory

challenges.  Notwithstanding West Virginia Code § 62-3-8, a trial court has discretion to

award additional peremptory challenges under Rule 24 of the West Virginia Rule of Criminal

---

[25]*See U.S. v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) ("[W]e have long recognized, as well, that such [peremptory] challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension").

[26]*See* W.Va. Code § 62-3-3 (2014) (providing an accused in felony case with six peremptory challenges); W.Va. R. Crim. P. 24(b)(1)(A) (same)).

Procedure, which provides, in relevant part, as follows:

> (b) *Peremptory Challenges.* —
>
> • • • •
>
> (2) Relief from Limitations. — (A) For Cause. — For good cause shown, the court may grant such additional challenges as it, in its discretion, believes necessary and proper.
> (B) Multiple defendants. — If there is more than one defendant the court may allow the parties additional challenges and permit them to be exercised separately or jointly.
> (C) Time for making motion. — A motion for relief under subdivision (b)(2) of this rule shall be filed at least one week in advance of the first scheduled trial date or within such other time as may be ordered by the circuit court.

Although the petitioners' assertion that Rule 24 is the paramount authority regarding peremptory challenges is accurate,[27] critically, neither petitioner filed a pretrial motion under Rule 24(b) seeking additional peremptory challenges.[28]  Rule 24(b)(2)(C) provides in mandatory terms that such a motion "shall be filed" within the time frame set forth therein. Accordingly, we now hold that when an accused, who is being tried jointly for a felony offense with co-defendants, seeks to avoid the sharing of six peremptory challenges, as provided under West Virginia Code § 62-3-8 (2014), he or she must file a motion expressly

---

[27]*See* Syl. Pt. 5, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999) ("The West Virginia Rules of Criminal Procedure are the paramount authority controlling criminal proceedings before the circuit courts of this jurisdiction; any statutory or common-law procedural rule that conflicts with these Rules is presumptively without force or effect.").

[28]A question arose during jury voir dire regarding the number of peremptory challenges the co-defendants would have in selecting an alternate juror.  The question was mooted by the trial court's decision to proceed without an alternate juror.

13

requesting additional peremptory challenges in accordance with Rule 24(b)(2) of the West Virginia Rules of Criminal Procedure. The trial court's ruling on a Rule 24(b)(2) motion shall be at its sole discretion.

In the case at bar, the petitioners never sought an award of additional peremptory challenges, either through a pre-trial motion filed under Rule 24(b)(2) or orally during jury voir dire at trial. Consequently, they raise their peremptory challenge issue in the context of the trial court's denial of their motions to sever their trials filed under West Virginia Rule of Criminal Procedure 14(b).

Rule 14(b) provides, in part, that "[i]f the joinder of defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the State, the Court *may* sever the defendants' trials, or provide whatever other relief that justice requires." W.Va. R. Crim. P. 14(b) (emphasis added.). In other words, it is within the trial court's discretion as to whether to grant a motion to sever the trials of jointly indicted defendants. We recently emphasized a trial court's discretion in this regard.

14

In *State v. Boyd*, Nos. 15-0878 and 15-0894, __ W.Va. __, __ S.E.2d __, 2017 WL 372177 (Jan. 19, 2017),[29] we held that "[t]his Court will not reverse a denial of a motion to sever properly joined defendants unless the [petitioner] demonstrates an abuse of discretion resulting in clear prejudice." *Boyd*, __W.Va. at __, __ S.E.2d at __, 2017 WL 372177, *1, syl. pt. 3. In the case at bar, the trial court denied the petitioners' motions to sever, noting the "cost of separate trials to tax payers and judicial economy."[30] The trial court found that the defendants' positions were "not inherently inconsistent, such that a joint trial would prevent any defendant from asserting a proper defense." The lower court also considered the "undue burden" that would be placed on "the cooperating witnesses" if there were multiple trials. Recognizing the permissibility of joint trials under Rule 14(b) of the West Virginia Rules of Criminal Procedure, "unless prejudice to the defendants can be shown," the trial court found there was no evidence that "any prejudice would inure to the detriment of any defendant with a unitary trial." We agree with the trial court's sound reasoning in this regard.

[29]Although our new syllabus points in *Boyd* emphasize the discretion provided to trial courts under West Virginia Rule of Criminal Procedure Rule 14, to the extent they constitute new points of law, they are applicable to the case a bar. *See* Syl. Pt. 3, *State v. Gangwer*, 168 W.Va. 190, 283 S.E.2d 839 (1981) ("In the absence of any substantial countervailing factors, where a new rule of criminal law is made of a nonconstitutional nature, it will be applied retroactively only to those cases in litigation or on appeal where the same legal point has been preserved.").

[30]*See Zafiro v. U.S.*, 506 U.S. 534, 540 (1993) (citation omitted) (finding rules of criminal procedure allowing for co-defendants to be tried jointly "are designed 'to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'").

As discussed, the petitioners challenge the trial court's denial of their motions to sever because their joint trial required them to share peremptory strikes, as provided under West Virginia Code § 62-3-8. Critically, they have not indicated any disagreement amongst themselves in the exercise of their shared peremptory challenges during jury voir dire. Moreover, during oral argument, the State represented to this Court that defense counsel worked in concert during jury voir dire in utilizing their peremptory challenges, and the petitioners did not indicate anything to the contrary on rebuttal. Accordingly, in the absence of either a motion filed under West Virginia Rule of Criminal Procedure 24(b)(2), an oral request during jury voir dire for additional peremptory challenges, or any evidence that the composition of the petitioners' jury was unfair, we find there has been no demonstration of an abuse of discretion in the trial court's denial of the petitioners' motions to sever resulting in clear prejudice.

**B. Denial of Motion to Sever**

Petitioner Goodman also asserts the trial court abused its discretion in denying his motion to sever because the joint trial led to the admission of evidence that was irrelevant, as to him, and which connected only petitioner Gibbs to the crimes charged. The evidence he cites includes the police photographs of the yard at Gibbs's residence; the items law enforcement recovered from Gibbs's yard, including shotgun shell casings and wadding, a gun, pieces of the safe, and Gibbs's cell phone; and the stolen crossbow, athletic shoes, and

16

safe seized from Ms. Wicker's residence. Arguing further, Goodman states that even if this evidence were relevant, its probative value was outweighed by its prejudicial effect. Conversely, the State maintains the trial court was within its discretion to order a joint trial; that the evidence was virtually the same for all of the co-defendants, having arisen from the same criminal enterprise; and that petitioner Goodman has not shown actual prejudice. The State further argues that any error in this regard was harmless given the testimony of Kentrell G. and Wicker, which implicated petitioner Goodman in the crimes and was sufficient to convict.

We recently held that

[a] trial court should grant a severance under Rule 14(b) of the West Virginia Rules of Criminal Procedure only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.

*Boyd*, __ W.Va. at __, __ S.E.2d at __, 2017 WL 372177, *1, syl. pt. 5. Moreover, "[a] defendant is not entitled to relief from prejudicial joinder pursuant to Rule 14 of the West Virginia Rules of Criminal Procedure[] when evidence of each of the crimes charged would be admissible in a separate trial for the other." Syl. Pt. 2, *State v. Milburn*, 204 W.Va. 203, 511 S.E.2d 828 (1998); *see also State v. Grantham*, No. 12-1293, 2013 WL 6152080, *3 (W.Va. Nov. 22, 2013) (memorandum decision) ("The evidence against both co-defendants was inextricably intertwined and arose from the same act or transaction, and the

17

co-defendants did not put on conflicting defenses."); *State v. Cross*, No. 13-0260, 2013 WL

5966968, *4 (W.Va. Nov. 8, 2013) (memorandum decision) ("The circuit court properly

found that the evidence against petitioner and his co-defendant was inextricably intertwined,

arose from the same act or transaction, and required the presentation of identical evidence

by the State."). Finally, "'[a] trial court's evidentiary rulings, as well as its application of the

Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4,

*State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998)." Syl. Pt. 1, *State v. Timothy*

*C.*, 237 W.Va. 435, 787 S.E.2d 888 (2016).

Although petitioner Goodman contends that certain evidence would not have

been admissible had he been tried separately, our review of the trial transcript reveals that

the State's evidence arose out of the same criminal enterprise and was relevant to all of the

co-defendants. The evidence recovered from Gibbs's yard, *i.e.*, the shotgun wadding and

shells and pieces of plastic from Gunn's safe, all related to the opening of the safe. Kentrell

G. testified that petitioner Goodman carried the safe from the Knights' home to the getaway

vehicle[31] and later opened the safe by firing a shotgun at it in Gibbs's yard. Further, the items

taken during the robbery were recovered by law enforcement at Ms. Wicker's home, which

is where petitioner Goodman frequently stayed; where he was the evening before the robbery,

planning the same with his brother, Kentrell G; and where he was around noon the day of the

---

[31]Rashod Wicker testified similarly.

18

robbery, when Ms. Hess's car was returned and the stolen items were brought into Ms. Wicker's home. Moreover, Andrew Gunn made an in-courtroom identification of petitioner Goodman as one of the robbers, and Ms. Hess's testimony was highly incriminating to petitioner Goodman, as well. In short, even if the State's physical evidence were excluded in a separate trial, the testimony of Gunn, Hess, the Knights, and, in particular, that of co-defendants Kentrell G. and Wicker, would be sufficient to convict petitioner Goodman. Accordingly, there being no clear prejudice to petitioner Goodman, we find no abuse of discretion in the trial court's denial of his motion to sever.

### C. Insufficiency of the Evidence

Petitioner Gibbs argues that the robbery count in his indictment and the jury instruction on robbery should have included the words "bodily fear" and, if they had, then the State's evidence would have been insufficient to convict him[32] because Andrew Gunn

---

[32]We have long held that

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside

(continued...)

19

testified that he was not afraid during the robbery.[33]  Critically, however, petitioner Gibbs

failed to challenge either the indictment[34] or the jury instruction[35] on robbery below.

---

[32](...continued)
> only when the record contains no evidence, regardless of how it
> is weighed, from which the jury could find guilt beyond a
> reasonable doubt.

Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

[33]Andrew Gunn was the named victim in the robbery count of the indictment.

[34]*See* Syl. Pt. 1, *State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535 (1996) ("Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure requires that a defendant must raise any objection to an indictment prior to trial. Although a challenge to a defective indictment is never waived, this Court literally will construe an indictment in favor of validity where a defendant fails timely to challenge its sufficiency. Without objection, the indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense under West Virginia law or for which the defendant was convicted.").

[35]Rule 30 of the West Virginia Rules of Criminal Procedure provides, in part, that

> [n]o party may assign as error the giving or the refusal to give an
> instruction or the giving of any portion of the charge unless that
> party objects thereto before the arguments to the jury are begun,
> stating distinctly the matter to which that party objects and the
> grounds of the objection; but the court or any appellate court
> may, in the interest of justice, notice plain error in the giving or
> refusal to give an instruction, whether or not it has been made
> the subject of objection.

Assuming, *arguendo*, that the jury instruction on robbery was flawed, Goodman would not be entitled to relief under the plain error doctrine.  In *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988), we held:

> Where an instruction is given which improperly defines
> the crime of aggravated [first degree] robbery, but there is

(continued...)

20

Nonetheless, even if such challenges had been raised, they would have been unavailing.

Petitioner Gibbs correctly notes that the words "bodily fear" appear in West Virginia Code § 62-9-6 (2014), which sets forth a form indictment for robbery:

> An indictment for robbery shall be sufficient if it be in form, tenor or effect as follows . . . :
>
> That A .........., on the .......... day of .........., nineteen .........., in the said county of .........., being armed with a dangerous and deadly weapon (if not armed, leave out allegation of being armed), in and upon one B .......... an assault did feloniously make, and him, the said B .......... did then and there feloniously put in *bodily fear*, and (here set out the articles of money stolen, as the case may be), all the property of the said B .........., and lawfully in his control and custody, from the person of the said B .........., and against his will, then and there feloniously and violently did steal, take and carry away, against the peace and dignity of the State.

(Emphasis added). Unlike West Virginia Code § 62-9-6, which was enacted in 1931 and has never been amended since, the robbery statute, West Virginia Code § 61-2-12, has been amended over the years and currently provides, in relevant part, as follows:

> (a) Any person who commits or attempts to commit robbery by:

---

[35](...continued)
> substantial evidence introduced proving such robbery, and the defendant admits a robbery occurred and relies solely on an alibi defense, such instructional error when not objected to at trial will not be subject to the plain error doctrine.

*Id.*, 180 W.Va. at 344-45, 376 S.E.2d at 550-51, syl. pt. 5. Here, there was substantial evidence proving the robbery. Further, petitioner Gibbs did not deny that the robbery occurred; instead, he simply testified that he did not participate in it.

21

(1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

*Id.*[36]  As is apparent, the words "bodily fear" do not appear in the statutory elements for first degree robbery.  We previously explained that

> [a]t common law, the definition of robbery was (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods. (Internal citations omitted).  Thus, at common law, robbery could be accomplished either by actual physical force or violence inflicted on the victim or by intimidating the victim by placing him in fear of bodily injury. (Internal citations omitted). 708 (1940).  There were no degrees or grades of common law robbery.
>
> W.Va. Code, 61-2-12, enacted in 1931, divides robbery into two separate classes and calls for different penalties: (1) robbery by violence or by the use of a dangerous weapon, and (2) all other robberies.  By dividing robbery into these two categories, our legislature joined a number of other legislatures in recognizing a greater culpability and more severe punishment

---

[36]When last amended in 2000, the Legislature largely rewrote and reorganized West Virginia Code § 61-2-12.  Accordingly, what this Court previously referred to as aggravated robbery is now first degree robbery.  *See Boxley v. Paugh*, No. 14-1006, 2015 WL 3691332, *1 (W.Va. June 15, 2015) (memorandum decision) ("In March of 1999, petitioner was convicted, by jury, of one count of fleeing an officer and one count of aggravated robbery, now first-degree robbery.")*; State v. Mayo*, No. 13-1003, 2014 WL 6634229, *3 (W.Va. Nov. 24, 2014) (memorandum decision) ("[*State v.*] *Ross* [184 W.Va. 579, 402 S.E.2d 248 (1990)] concerned a constitutional challenge to a sentence for aggravated robbery, now first degree robbery.").

22

for a robbery committed by violent means than for a robbery committed by nonviolent means. (Internal citation omitted).

*State v. Harless*, 168 W.Va. 707, 709-10, 285 S.E.2d 461, 463-64 (1981) (footnotes omitted).

With specific regard to the absence of the words "bodily fear" in the indictment and in the jury instruction on robbery,

> [w]e previously noted that under the common law definition robbery could be committed by two general means. The first was by force and violence to the person, in which event there is no necessity to prove that the victim was placed in fear of bodily injury, since the actual force on the victim can be presumed to have engendered fear. (Internal citations omitted).
>
> The second common law means of committing robbery was through intimidation, that is, by placing the victim in fear, usually of bodily injury. It is this second category under the common law definition which encompasses our nonaggravated [second degree] form of statutory robbery. Therefore, the distinguishing feature of a nonaggravated [second degree] robbery is that it is accomplished, not through violence to the victim or the threat or presentation of firearms or other deadly weapon or instrumentality, but through intimidation that induces fear of bodily injury in the victim. *In the case of an aggravated* [first degree] *robbery, fear of bodily injury is not an essential element of the crime, since the actual physical force or violence or threat or presentation of firearms or other deadly weapon or instrumentality can be presumed to have created fear of bodily injury*.

*Id.,* 168 W.Va. at 712, 285 S.E.2d at 465 (footnotes omitted) (emphasis added). Dispositive of the issue before us, we also stated in *Harless* that

> [a]n appropriate charging portion of an instruction for "aggravated" robbery would be:
>
> "Aggravated robbery is defined as the unlawful

23

> taking and carrying away of money or goods from the person of another, or in his presence, by the use of force or violence on the victim or through the use of a dangerous or deadly weapon or instrumentality, and with the intent to steal such property."

*Id.,* 168 W.Va. at 712 n.8, 285 S.E.2d at 465 n.8.  In short,

> [a] plain reading of subsections (a) and (b) of W.Va. Code, § 61-2-12 shows that the Legislature has more or less codified the common law definition of robbery and graded the degrees of robbery according to the level of violence involved, with First Degree encompassing the more dangerous and violent forms of robbery (the common law equivalent of "robbery by force") and Second Degree encompassing the less dangerous forms of robbery (the common law equivalent of "robbery by fear").
>
> In this appeal, the defendant was charged with First Degree Robbery.  First Degree Robbery required that the State prove beyond a reasonable doubt that the offense alleged was committed with "violence to the person" or that the offense was committed with a "threat of deadly force by the presenting of a firearm or other deadly weapon."  W.Va. Code, § 61-2-12 (a)[.]

*State v. Hatley*, 223 W.Va. 747, 753-54, 679 S.E.2d 579, 585-86 (2009) (Ketchum, J., concurring).

Based on the above, the robbery count in the subjct indictment was sufficient to charge first degree robbery in violation West Virginia Code § 61-2-12(a). *See* Syl. Pt. 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983) ("An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute,

fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.").[37]  Inasmuch as "bodily fear" is not an element of first degree robbery under West Virginia Code § 61-2-12(a), those words had no place in either the indictment or the jury instruction.[38]

Under West Virginia Code § 61-2-12(a), the State had to prove beyond a reasonable doubt that the robbery was committed with either "violence to the person" or with a "threat of deadly force by the presenting of a firearm or other deadly weapon[.]"  Absent his unavailing argument regarding "bodily fear," petitioner Gibbs does not assert that the

[37]The robbery count in the indictment charged in pertinent part, as follows:

> **ANTWYN D. GIBBS, KENTRELL GOODMAN, KEVIN GOODMAN, JR., RADEE M. HILL and RASHOLD C. WICKER**, on or about the 9th day of January, 2015 . . . committed the offense of "robbery in the first degree" in that they, by the threat of deadly force by the presentment of a firearm, in and upon one Andrew Gunn, an assault did feloniously make, and one . . . crossbow, one pair Jordan Columbia 11 shoes, one pair Jordan Infrared 6 shoes and/or one safe containing United States Currency, of the property of the said Andrew Gunn, and lawfully in the control and custody of the said Andrew Gunn, from the person of or from the presence of Andrew Gunn and against his will, then and there feloniously and violently did steal, take and carry away the same, with intent to permanently deprive the owner thereof, against the peace and dignity of the State.  W.Va. Code § 62-2-12(a).

[38]As indicated previously, West Virginia Code § 62-9-6, which sets forth suggested language for a robbery indictment, has not been amended since its enactment in 1931.  The Legislature may want to amend West Virginia Code § 62-9-6 to bring it into conformity with its prior amendments to West Virginia Code § 61-2-12.

25

State's evidence was otherwise insufficient to convict him of first degree robbery. Indeed, it is abundantly clear that under *Guthrie*, 194 W.Va. 657, 461 S.E.2d 163,[39] the State's evidence at trial was sufficient for the jury to find beyond a reasonable doubt that petitioner Gibbs committed the first degree robbery of Andrew Gunn by unlawfully carrying away goods belonging to Gunn through the threat of deadly force by presenting firearms. Accordingly, we find that petitioner Gibbs is not entitled to relief from his robbery conviction on this basis.

### D. Sentencing

Petitioner Goodman asserts that his sentence of fifty years incarceration for first degree robbery is disproportionate to his crime in violation of Article III, Section 5 of the West Virginia Constitution.[40] This Court "reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997).

We begin our analysis by acknowledging the broad discretion given to trial courts under West Virginia Code § 61-2-12(a), which provides only a minimum sentence of

---

[39]*See supra* note 32.

[40]Article III, section 5 of the West Virginia Constitution provides, in relevant part, as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the offence."

ten years without proscribing a maximum number of years.[41] *See State ex rel. Faircloth v. Catlett*, 165 W.Va. 179, 181, 267 S.E.2d 736, 737 (1980) ("It [armed robbery] is punishable by a term of not less than ten years, which may be any number of years from ten to life. The Legislature chose not to deprive trial courts of discretion to determine the appropriate specific number of years of punishment for armed robbery, beyond ten."). Notwithstanding this broad discretion, we employ two tests in determining whether a sentence is constitutionally disproportionate to the crime: one is subjective and the other objective. Under the subjective test,

> [p]unishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity, thereby violating West Virginia Constitution, Article III, Section 5 that prohibits a penalty that is not proportionate to the character and degree of an offense.

---

[41]The trial court recounted various factors it considered before sentencing petitioner Goodman, including his chronic unemployment; his denial of any responsibility for the crime; his criminal history, including a prior burglary conviction in Fayette County, West Virginia; his degree of culpability because the evidence demonstrated that he and his brother Kentrell G. were the "main players" in the crime; and an LS/CMI score that placed him in the very high risk category to re-offend with a "99% chance of recidivating." *See State v. Wilson*, 237 W.Va. 288, __ n.8, 787 S.E.2d 559, 563 n.8 (2016) ("The LS/CMI is an assessment system that measures an[] offender's risk and need factors for purposes such as sentencing."). The trial court also observed that the involvement of firearms during the robbery presented a high degree of danger and potential for harm to the persons in the home at the time, including Mrs. Knight, who has a heart condition, and her five-year-old granddaughter, who was extremely frightened.

Syl. Pt. 5, *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983). Conceding that his argument fails the subjective test, Petitioner Goodman focuses his proportionality challenge on our objective test, which provides that

> "[i]n determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction." Syllabus point 5, *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981).

Syl. Pt. 2, *State v. Adams*, 211 W.Va. 231, 565 S.E.2d 353 (2002). Essentially conceding the first two factors of the objective test,[42] petitioner Goodman concentrates his arguments on

---

[42]In *State v. Mann*, 205 W.Va. 303, 518 S.E.2d 60 (1999), this Court considered the nature of the offense of robbery and the legislative purpose behind sentencing for that offense, *i.e.*, the first two factors under the objective test for proportionality, stating as follows:

> This Court has recognized that the Legislature, by not expressly fixing a maximum term, has impliedly authorized life imprisonment as the maximum penalty for aggravated [first dgree] robbery. The Legislature has chosen not to deprive trial courts of discretion to determine the appropriate determinate term for life or for a specific number of years above the statutory minimum as the sentence for aggravated robbery. This legislatively created statutory minimum/discretionary maximum sentencing scheme for aggravated robbery serves two purposes. First, it gives recognition to the seriousness of the offense by imposing a minimum sentence below which a trial court may not go. Second, the open-ended maximum sentencing discretion allows trial courts to consider the weight of aggravating and mitigating factors in each particular case.

(continued...)

28

the third and forth factors: a comparison of the punishment with what would be imposed in

other jurisdictions and a comparison with other offenses within this jurisdiction.[43] We

readily dispose of these factors by relying upon our recent decision affirming co-defendant

Radee Hill's sentence of fifty years incarceration for his first degree robbery conviction.[44]

In addressing Hill's challenge, we found his sentence to be proportional to the

crime committed under the objective test, stating as follows:

> In comparing the length of petitioner's sentence with
> what would be inflicted in other jurisdictions, this Court has
> previously recognized that other jurisdictions permit long prison

---

[42](...continued)
*Mann*, 205 W.Va. at 315-16, 518 S.E.2d at 72-73 (internal citations and footnote omitted).

[43]Petitioner Goodman states that during his sentencing hearing, he reminded the trial court that the maximum penalty for second degree murder is forty years, which he offers in support of having raised the issue of proportionality below. *See* W.Va. Code § 61-2-3 (2014) ("Murder of the second degree shall be punished by a definite term of imprisonment in the penitentiary which is not less than ten nor more than forty years."). Goodman argues that, at a minimum, his case should be remanded for re-sentencing because the trial court did not make findings regarding proportionality. Although Goodman relies upon *Crawford v. Ballard*, No. 11-0783, 2011 WL 8193068 (W.Va. Nov. 28, 2011) (memorandum decision), for his argument, that case involved the circuit court's denial of a petition for a writ of habeas corpus, which raised proportionality in sentencing as one of the bases for habeas relief. In short, even if we were to assume that Goodman adequately raised the issue of proportionality below, our discussion in *Crawford* would not require us to remand this case for the purpose of the trial court making findings regarding proportionality.

[44]As indicated previously, petitioners Goodman and Gibbs, as well as co-defendant Hill, each received the same sentences for their robbery convictions.

sentences for first-degree robbery. *See id.*[45] at 235, 565 S.E.2d at 357 (citing *State v. Boag*, 453 P.2d 508 (Ariz. 1969) (imposing seventy-five to ninety-nine-year sentence); *State v. Victorian*, 332 So.2d 220 (La. 1976) (imposing forty-five-year sentence); *State v. Hoskins*, 522 So.2d 1235 (La. Ct. App. 1988) (imposing ninety-nine-year sentence); *People v. Murph*, 463 N.W.2d 156 (Mich. Ct. App. 1990) (imposing two forty-six-year sentences); *State v. Morris*, 661 S.W.2d 84 (Mo. Ct. App. 1983) (imposing life sentence); *Robinson v. State*, 743 P.2d 1088 (Okla. Crim. App. 1987) (imposing 100-year sentence)).[46]

_____

[45]*State v. Adams*, 211 W.Va. 231, 565 S.E.2d 353 (2002).

[46]In *State ex rel. Ballard v. Painter*, 213 W.Va. 290, 582 S.E.2d 737 (2003), this Court addressed the defendant's claim that his sentence was disproportionate to his crime. In applying the objective test, we stated, in part, as follows:

> *(B) Comparing sentences*. Mr. Ballard concedes that the sentence imposed [fifty years imprisonment for aiding and abetting armed robbery] is not disproportionate with sentences imposed in other jurisdictions . . . . *See*, *e.g.*, *State v. Boag*, 104 Ariz. 362, 453 P.2d 508 (1969) (75 to 99 year sentence); *People v. Isitt*, 55 Cal.App.3d 23, 127 Cal.Rptr. 279 (1976) (life sentence); *State v. Hoskins*, 522 So.2d 1235 (La. Ct. App. 1988) (99 year sentence); *People v. Murph*, 185 Mich.App. 476, 463 N.W.2d 156 (1990) (two 40 to 60 year sentences); *State v. Morris*, 661 S.W.2d 84 (Mo. Ct. App. 1983) (life sentence); *Robinson v. State*, 743 P.2d 1088 (Okla. Crim. App. 1987) (100 year sentence).

*Ballard*, 213 W.Va. at 294, 582 S.E.2d at 741. Additional examples of sentences imposed in other jurisdictions were cited in *State v. Glover*, 177 W.Va. 650, 355 S.E.2d 631 (1987):

> Robbery has always been regarded as a crime of the gravest character. *State v. Newman*, 108 W.Va. 642, 646, 152 S.E. 195, 196 (1930). Other jurisdictions agree. *See, e.g., . . . State v. Victorian*, 332 So.2d 220, 221-22 (La. 1976) (45 years without possibility of parole is not "cruel, excessive or unusual punishment" for armed robbery, under statute authorizing

(continued...)

30

*Hill*, 2016 WL 6678997, *2-3 (footnotes added). Regarding Hill's sentence in comparison

with other offenses within this jurisdiction, we stated:

> Lastly, comparing the punishment with other offenses within this jurisdiction, this Court has rejected proportionality challenges in many cases involving first-degree robbery, even where the sentences imposed have exceeded petitioner's. *Adams*, 211 W.Va. at 235, 565 S.E.2d at 357 (citing *State v. Williams*, 205 W.Va. 552, 519 S.E.2d 835 (1999) (upholding fifty-year sentence for attempted aggravated robbery); *State v. Phillips*, 199 W.Va. 507, 485 S.E.2d 676 (1997) (upholding 140-year sentence for two counts of aggravated robbery and one count of kidnapping); *State v. Ross*, 184 W.Va. 579, 402 S.E.2d 248 (1990) (upholding 100-year sentence for attempted aggravated robbery); *State v. Spence*, 182 W.Va. 472, 388 S.E.2d 498 (1989) (upholding sixty-year sentence for aggravated robbery); *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988) (upholding life sentence for aggravated robbery); *State v. Brown*, 177 W.Va. 633, 355 S.E.2d 614 (1987) (upholding sixty-year sentence for aggravated robbery); *State v. Glover*, 177 W.Va. 650, 355 S.E.2d 631 (1987) (upholding seventy-five-year sentence for aggravated robbery)).[47]

---

[46](...continued)
> between 5 and 99 years without possibility of parole); *Garrett v. State*, 486 S.W.2d 272, 274 (Mo. 1972) (99 years for first degree robbery, with a prior felony, is not excessive punishment).

*Glover*, 177 W.Va. at 659, 355 S.E.2d at 640.

[47]*See also State v. Richardson*, No.14-0382, 2016 WL 5030312 (W.Va. Sept. 16, 2016) (memorandum decision) (addressing proportionality challenge and finding no error in 100-year sentence for first degree robbery); *State v. Chapman*, No. 14-0442, 2015 WL 2382559 (W.Va. May 18, 2015) (memorandum decision) (finding eighty-year sentence for first degree robbery was not disproportionate to crime).

In *Adams*, this Court upheld a ninety-year sentence for first-degree robbery. 211 W.Va. 231, 565 S.E.2d 353. That sentence was upheld in spite of the fact that neither a deadly weapon nor extreme violence was used during the commission of the crime. *Id.* at 232, 565 S.E.2d at 354. In the instant case, petitioner's sentence was only slightly more than half of Mr. Adams's, and petitioner used a gun in the commission of this crime to intimidate and scare vulnerable victims. Thus, we find that petitioner's sentence is not disproportionate to the crime committed.

*Hill*, 2016 WL 6678997, *2-3 (footnote added). For the same reasons we articulated in co-defendant Hill's appeal, we find petitioner Goodman's sentence of fifty years incarceration for first degree robbery is not disproportionate to the crime committed.

## IV. Conclusion

For the reasons stated above, the convictions and sentencing of petitioners Antwyn D. Gibbs (Case No. 16-0044) and Kevin Goodman, Jr. (Case No. 15-1193) are hereby affirmed.

Affirmed.

32