# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**John Chadrick Yost,**
**Petitioner Below, Petitioner**

**vs) No. 17-0728** (Raleigh County 11-C-1045-K)

**Ralph Terry, Superintendent,**
**Mount Olive Correctional Center,**
**Respondent Below, Respondent**

**FILED**

**October 10, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner John Chadrick Yost, by counsel Mark Hobbs, appeals the July 20, 2017, order of the Circuit Court of Raleigh County that denied his petition for post-conviction habeas corpus relief. Respondent, Superintendent Ralph Terry,[1] Mount Olive Correctional Center, by counsel Scott E. Johnson, responds in support of the habeas court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On January 7, 2006, petitioner stole a Kia Rio automobile from its owner at gunpoint. Three days later, a state trooper spotted the Rio in a parking lot. When the trooper approached the Rio, the driver drove away at a high rate of speed, striking the police cruiser in the process. The trooper recognized the driver, but did not know his name. Thereafter, the trooper identified petitioner as the driver. The police later found the Rio wrecked.

Less than a month later, on the evening of February 3, 2006, petitioner pointed a gun at a post office customer, threatened to kill her, and demanded the keys to her Geo Tracker (valued at $10,000), which the customer handed over. Petitioner also stole $20 from the customer at gunpoint. Petitioner fled in the Tracker, but the police spotted him and another high-speed chase ensued. Petitioner eventually abandoned the Tracker and fled on foot, escaping capture. The keys for the Tracker were later found at petitioner's residence.

---

[1] Effective July 1, 2018, the positions formerly designated as "wardens" are now "superintendents." *See* W.Va. Code § 15A-5-3. At the time of the filing of this appeal, David Ballard was then warden at Mount Olive Correctional Complex and, as such, was originally listed as the respondent below. However, the acting warden, now superintendent, is Ralph Terry. Accordingly, the Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

In the early morning hours of February 4, 2006, petitioner stole a 2005 Nissan Armada (valued at $35,000) from the owner's driveway. Thereafter, when a state trooper saw petitioner removing items from the Armada and ordered petitioner to exit the vehicle, petitioner drove the car directly at the trooper and then commenced yet another high-speed chase. The state police set up a roadblock, which petitioner ran as troopers fired shots at him. Thereafter, petitioner set the Armada on fire, rendering it a total loss.

Later that same morning, State Police Capt. Scott Van Meter found petitioner at his mother's home. Capt. Van Meter and Sgt. G.A. Duckworth transported petitioner in handcuffs to a state police detachment. During that trip, petitioner stated that drugs caused him to do stupid things and that he wanted to get off drugs. Capt. Van Meter then said to petitioner that if he had tossed his gun, a child might pick it up, so the gun should be placed in a secure place. Petitioner told the officers where his gun was located. The police found the loaded gun in that location. Thereafter, at the detachment and prior to questioning, an officer reviewed petitioner's *Miranda*[2] rights with him. Petitioner gave a lengthy statement during which he admitted to both robberies, to stealing and burning the Nissan Armada, and to the high-speed chases.

On January 8, 2007, petitioner was indicted on two counts of first-degree robbery, three counts of grand larceny, three counts of attempted first-degree murder, two counts of being a felon in possession of a firearm, two counts of fleeing law enforcement in a vehicle, one count of third degree arson, and one count of fleeing from law enforcement on foot.

Pretrial, petitioner's counsel moved to suppress petitioner's statement to the police on the grounds that it was involuntary and coerced. The trial court held evidentiary hearings on August 31, 2006, and September 21, 2006. At the hearing, petitioner testified, as did all of the arresting and investigating police officers involved in this case. Capt. Van Meter testified as follows:

> *The State*: Could you tell the Court any information you have as to any promises you made to Mr. Yost?
>
> *Capt. Van Meter*: At one point before, I think, we even left the house, I know this mother, I actually made a promise to her, I think. She was concerned . . . for her son's safety. She said [a particular trooper] didn't like her son and she was worried that [the trooper] would harm [petitioner] and I assured him that – assured her that [the trooper] would not harm [petitioner].
>
> *The State*: Did you make any other promises to [petitioner]?
>
> *Capt. Van Meter*: When we got in the car, [Sgt.] Duckworth was driving and I rode and put [petitioner] in the backseat. [Sgt. Duckworth] had made a comment – I wouldn't say this was a promise but he made a comment that, you know, if [petitioner is] really wanting to get off drugs, he needs to – he's going to have to do it himself. He can't – no one else is going to do it for him. He's got to take that first step, go see a counselor, see a minister or something like that.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

And the only other thing I can remember talking about [petitioner] was after he was arrested, probably a couple weeks, maybe a week, maybe more, his mother called me at the office one day, and she was asking questions about hearings and things like that, and she said something about the federal court and state court and I tried to explain to her a little bit that it was two different things. And I did make the comment that if it was me, I'd try to stay away from federal court.

Petitioner testified that when he confessed, he was under the influence of marijuana, various narcotics, and copious amounts of beer and liquor. Petitioner also testified that Capt. Van Meter promised to "help [petitioner] the best that he could" during the interrogation. Petitioner then testified as follows:

> *Petitioner's counsel:* Why did you give a statement?

> *Petitioner:* That's what was suggested of me to do so they would work with me on making things easier on me. That's the only way that I knowed [sic] to go ahead and finish everything out. I mean --

> *Petitioner's counsel:* Did the trooper --

> *Petitioner:* I didn't know anything else to do.

> *Petitioner's counsel:* Did Trooper Van Meter explain how it was that he would help you?

> *Petitioner:* No.

> *Petitioner's counsel:* Did you believe that he would help you?

> *Petitioner:* I believed that there was some form of help going to be given to me as far as acknowledging . . . I should do this or should do that. I didn't even think about that I needed to get a lawyer because, you know, the way that I understood it, that if I cooperated with him and gave him where the gun was at and he would do what he could to help me. And, as far as I know, he said to go on down and be truthful and give a statement and he'd see what he could do.

> *Petitioner's counsel:* And has he helped you?

> *Petitioner:* I haven't heard from the man.

Also at the pretrial hearing, Dr. Fred J. Krieg, a clinical psychologist and petitioner's expert, testified that he examined petitioner and evaluated his confession and the police report. Dr. Krieg concluded that, when petitioner confessed to the police, the drugs and alcohol he had

3

consumed (1) impaired his ability to articulate, his judgment, and his critical thinking; and (2) caused him to be unduly swayed by Capt. Van Meter's promise of help.

By order entered October 25, 2006, the trial court denied petitioner's motion to suppress his confession. The trial court found that "[t]he record is absolutely clear that there was no specific promise made by anyone to [petitioner], or to [petitioner's] family, in return for [petitioner's] agreement to give a recorded statement."

Petitioner's jury trial commenced on April 27, 2007. Attorneys Steven K. Mancini and David Kelley represented petitioner at trial. During its case-in-chief, the State admitted petitioner's gun into evidence without objection from petitioner's trial counsel. The jury acquitted petitioner of the three counts of attempted first-degree murder, but convicted him on all other counts. On June 6, 2007, the trial court sentenced petitioner to a cumulative sentence of not less than thirty nor more than one-hundred-thirty-four years in prison.[3]

Post-trial, petitioner moved to vacate his two grand larceny convictions on the ground that they violated the prohibition against double jeopardy found in the Fifth Amendment to the United States Constitution and Article III, § 5 of the West Virginia Constitution. The trial court denied that and other motions on August 14, 2007. This Court denied petitioner's appeal of his conviction and sentences on February 26, 2009. The United States Supreme Court denied petitioner's petition for writ of certiorari on November 2, 2009. The trial court then denied petitioner's motion for reconsideration of sentence, pursuant to Rule 35(b) of the West Virginia Rules of Criminal Procedure, on March 12, 2010. Thereafter, petitioner sought habeas relief.

The habeas court appointed counsel who filed petitioner's amended habeas petition on December 18, 2013. Petitioner's *Losh*[4] list included fifteen issues. Habeas counsel submitted eleven of these issues to the habeas court without oral or written argument. Those eleven issues were (1) coerced confession; (2) excessiveness or denial of bail; (3) challenges to the composition of the grand jury or its procedure; (4) defects in the indictment; (5) non-disclosure of grant jury minutes; (6) instructions given to the jury; (7) claims of prejudicial statement of the trial judge; (8) sufficiency of the evidence; (9) improper communications between prosecutor and witness or jury; (10) excessive sentence; and (11) amount of time served on sentence, credit for time served. The four grounds supported by argument were: (1) double jeopardy; (2) consecutive sentences for the same transaction; (3) ineffective assistance of counsel; and (4) constitutional errors in evidentiary rulings. The habeas court held an omnibus evidentiary

---

[3] The trial court sentenced petitioner to the following periods of incarceration: fifty years in prison for each count of first-degree robbery; not less than one nor more than ten years in prison for the three counts of grand larceny; and three years in prison for the count of third-degree arson; each of these sentences was ordered to be served consecutively. The trial court also sentenced petitioner to one year for each of the three counts of fleeing law enforcement, and one year on each of the two counts of being a felon in possession of a firearm. The trial court then ordered these five misdemeanor sentences to be served concurrently with each other, but consecutively to the felony offenses.

[4] *See Losh v. McKenzie*, 166 W.Va. 762, 762, 277 S.E.2d 606, 607 (1981).

hearing on November 3, 2014, and June 17, 2015. By order entered July 20, 2017, the habeas court denied relief. Petitioner now appeals.

We apply the following standard of review in habeas appeals:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, of *Anstey v. Ballard*, 237 W.Va. 411, 787 S.E.2d 864 (2016).

Petitioner raises four assignments of error on appeal. Petitioner first argues that the trial court violated the prohibition against double jeopardy, i.e., that it punished him twice for a single offense when it sentenced him for both first-degree robbery and grand larceny. In support of this claim, petitioner cites to Syllabus Point 5 of *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982), in which we held that "[u]nder the legal test set out in Syllabus Point 1 of *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981), larceny is a lesser included offense of robbery." Thus, petitioner argues that where an act satisfies the common law definitions of both robbery and larceny, the trial court must consider the act as a single crime for double jeopardy purposes.

"The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution . . . protects against multiple punishments for the same offense." Syl. Pt. 1, *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992) "'[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' *Blockburger v. United States*, 284 U.S. 299 . . . (1932)." *Id.* at Syl. Pt. 4.

Petitioner's sentences for robbery and larceny do not violate the prohibition against double jeopardy. Our opinion in *State v. Plumley*, 181 W.Va. 685, 384 S.E.2d 130 (1989), a more recent case than *Neider* upon which petitioner relies, governs here. In Syllabus Point 3 of *Plumley*, 181 W.Va. at 687, 384 S.E.2d at 132, the Court cited to the test set forth in Syllabus Point 1 of *State v. Louk*, upon which the *Neider* Court also relied:

> "'[t]he test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. *An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense*.' Syllabus Point 1, *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981)." Syllabus Point 1, *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982).

(Emphasis added.) Here, grand larceny is not a lesser-included offense of aggravated robbery.

5

West Virginia Code § 61-2-12(a) [2000] defines "[a]ggravated robbery" as:

Any person who commits or attempts to commit robbery by:

(1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in ·a state correctional facility not less than ten years.

Grand larceny, as defined in West Virginia Code § 61-3-13(a) [1994], occurs where a person

commits simple larceny of goods or chattels of the value of one thousand dollars or more, such person is guilty of a felony, designated grand larceny, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years, or, in the discretion of the court, be confined in jail not more than one year and shall be fined not more than two thousand five hundred dollars.

Clearly, each crime has an element the other does not. Aggravated robbery requires the use of violence or threat of deadly force by the presenting of a firearm or other deadly weapon. Grand larceny requires the taking of goods or chattels valued at one thousand dollars or more. Therefore, under the aggravated robbery statute, the value of the property taken is irrelevant. *See State v. Davis*, 176 W.Va. 454, 465, 345 S.E.2d 549, 560 (1986). Likewise, under the grand larceny statute the use of violence or threat of deadly force is inconsequential. Accordingly, a defendant could rob a victim of property valued at less than $1,000 and be convicted of aggravated robbery, but not grand larceny. Likewise, that same defendant could steal property valued at a thousand dollars or more, without violence or threat of deadly force, and be convicted of grand larceny, but not aggravated robbery. "Once the determination is made that statutory offenses are separate under the *Blockburger* test by virtue of the fact that each provision requires proof of an additional fact which the other does not, then multiple punishments are appropriate." *State v. Zaccagnini*, 172 W.Va. 491, 502, 308 S.E.2d 131, 142 (1983).

Accordingly, we find that the habeas court correctly concluded that

[the State established] the different elements of aggravated robbery and grand larceny . . . at trial beyond a reasonable doubt, and petitioner was convicted of committing both crimes on two occasions. Accordingly, [petitioner] cannot meet the necessary requirements to establish a violation of the prohibition against [d]ouble [j]eopardy or the claim of [c]onsecutive [s]entence for the same [t]ransaction.

Petitioner next argues that his trial counsel were ineffective because they failed to move to suppress the gun used by petitioner during his crimes. Petitioner claims trial counsel should have moved to suppress the gun because the police who transported petitioner from his mother's home to the police detachment interrogated petitioner about the location of the gun before they read him *Miranda* warnings. Petitioner also highlights that his trial counsel failed to object to the

gun's admission at trial. Thus, petitioner concludes that (1) his trial counsel's performance fell below the standard of reasonableness, and (2) if trial counsel had moved to suppress the gun, the trial court would have granted that motion and the gun and petitioner's statements to the police in the cruiser would have been suppressed.

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

As noted above, Capt. Van Meter and Sgt. Duckworth testified at petitioner's suppression hearing that they questioned petitioner about the location of his gun as a matter of public safety. Therefore, the officers' questions fell within the public safety exception to *Miranda* articulated in *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, the Supreme Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. "[T]he 'prototypical example' for application of the public safety exception is the situation, as in *Quarles*, of a missing weapon." *Anderson v. Commonwealth*, 688 S.E.2d 605, 608 (Va. 2010) (citation omitted).

> In the order on appeal, the habeas court found that

> [t]he issue at bar is consistent with the narrow exception to the *Miranda* rule recognized in *Quarles*. Such exception is circumscribed in each case by the exigency which justifies it. In the instant case, the arresting officer asked the petitioner the question about the whereabouts of the gun, but it does not appear that Captain Van Meter's motivation was simply to obtain evidence useful in convicting the petitioner. An answer was needed to insure that future danger to the public, particularly children, did not result from the concealment of a loaded gun in an area possibly open to the public.

> In the instant case, petitioner's gun was found, in accordance with the petitioner's directions [in a camper near his mother's house]. The gun was readily accessible through a broken window in the camper. The gun was loaded with one live round of ammunition. This court opines that the gun did pose a very real danger, particularly to a child, who could conceivably discover and misuse the weapon.

Because the officers questions regarding the gun fell within the public safety exception to *Miranda* articulated in *Quarles*, we concur with the habeas court's finding that petitioner's trial counsel were not ineffective for failing to move to suppress the gun or to object to its admission at trial, because any such objection would have rightfully been overruled. Accordingly, we find no error.

7

Petitioner also argues that his trial counsel were ineffective because they failed to move to sever petitioner's January 7, 2006, offenses regarding the Kia Rio from his February 3-4, 2006, offenses regarding the Geo Tracker and the Nissan Armada due to the passage of time between the two sets of crimes. Trial counsel testified at the habeas hearing that it did not occur to him to file a motion to sever the charges for trial likely because "they were very close in time and of the same nature. . . ." Trial counsel also testified that, if he had filed a motion to sever, he probably would not have prevailed.

The "[m]ere lapse of time between the commission of the offenses does not render joinder improper. *United States v. Franklin*, 452 F.2d 926 (8th Cir.1971)." *State v. Rash*, 226 W. Va. 35, 43, 697 S.E.2d 71, 79 (2010). Accordingly, as the habeas court found, petitioner had no basis to object to the joinder of the offenses in his case and any motion by petitioner's counsel to sever the counts would have been an exercise in futility. Therefore, we concur with the habeas court's finding that trial counsel's performance was not deficient for failing to file a meritless motion to sever.

Petitioners' third assignment of error is that his sentence of up to 134 years in prison is disproportionate to his crimes in light of the fact that he was only 26 years old when he was convicted. This skeletal statement is petitioner's argument in total. "'A skeletal "argument," really nothing more than an assertion, does not preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs.'" *State Dept. of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). Moreover, petitioner fails to apply the subjective and objective proportionality tests set forth in *State v. Mann*, 205 W.Va. 303, 314-15, 518 S.E.2d 60, 71-72 (1999). However, even if petitioner had applied those tests, he would not have prevailed on this assignment of error. Petitioner committed violent crimes when he used a firearm to steal cars from two different people. The objective test is also satisfied given that "[r]obbery has always been regarded as a crime of the gravest character. *State v. Newman*, 108 W.Va. 642, 646, 152 S.E. 195, 196 (1930)." *State v. Glover*, 177 W. Va. 650, 659, 355 S.E.2d 631, 640 (1987). Further, "[t]his Court has previously recognized that other jurisdictions permit severe penalties for the crime of aggravated robbery[,]" many of which would be consistent with petitioner's robbery sentences. *Mann*, 205 W.Va. at 316, 518 S.E.2d at 73 (1999). Importantly, the Court has upheld robbery sentences consistent with petitioner's two fifty-year sentences for robbery. *Id.* at 317, 518 S.E.2d at 74 (citing *State v. Salmons*, 203 W.Va. 561, 509 S.E.2d 842 (1998) (affirming thirty-year sentences for aggravated robbery); *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995) (affirming forty-five year sentences for aggravated robbery); and *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988) (affirming life sentence for aggravated robbery).

Petitioners' fourth and final assignment of error is that his confession to the police was involuntary and coerced and, therefore, the trial court erred in failing to suppress it.

In the record on appeal, petitioner admits that Capt. Van Meter made no specific promises to petitioner as proved by petitioner's testimony at the suppression hearing:

8

> *The Court*: [Petitioner], I'm going to ask a couple of questions because I've got to get some clarification and I'll allow each [side] to follow up. What specific promise did [Capt.] Van Meter make to you?
>
> *Petitioner:* No specific promises was [sic] made to me, just that he would do whatever he could to help me.
>
> *The Court:* So the only promise that [Capt.] Van Meter made to you was, be honest, give a statement, and I'll help in whatever way I can?
>
> *Petitioner:* That's correct.

In light of this testimony, the habeas court found "[t]he record is absolutely clear that there was no specific promise made by anyone to [petitioner] . . . in return for [petitioner's] agreement to give a recorded statement."

Capt. Van Meter's statement to petitioner that "I'll help you anyway I can" does not rise to the level of coercing a confession. "A mere promise or assurance by police interrogators that they will try to help the defendant out is not sufficient to establish coercion." *Gregory v. Commonwealth of Kentucky*, No. 2013-CA-001247-MR, 2014 WL 3406683, at *6 (Ky. Ct. App. July 11, 2014). *See also Peek v. State*, 454 N.E.2d 450, 455-56 (Ind. Ct. App. 1983) ("Vague statements by the police that they will help the accused do not render the statement inadmissible.").

Moreover, both the trial court and the habeas court found that petitioner was not so intoxicated that his confession should be rendered involuntary. "A claim of intoxication may bear upon the voluntariness of a defendant's confession, but, unless the degree of intoxication is such that it is obvious that the defendant lacked the capacity to voluntarily and intelligently waive his rights, the confession will not be rendered inadmissible." Syl. Pt. 1, *State v. Hall*, 174 W.Va. 599, 600, 328 S.E.2d 206, 208 (1985). In this regard, State Police Sgt. Timothy Bragg testified at the suppression hearing that petitioner voluntarily signed the *Miranda* warnings form and voluntarily agreed to waive those rights, as follows:

> *The State*: When you went over [petitioner's] *Miranda* [r]ights, did he voluntarily sign that form?
>
> *Sgt. Bragg*: Yes, sir.
>
> *The State*: Did he voluntarily agree to waive those rights?
>
> *Sgt. Bragg*: Yes, sir. I read him his waiver of rights to him.
>
> *The State*: And you put no – put forth no physical threats of harm to him and no psychological threat of harm; is that a fair statement?
>
> *Sgt. Bragg*: That's correct.

9

*The State*: Did he ever ask you for an attorney and say, "Hey, I don't want to talk to you anymore," or anything like that?

*Sgt. Bragg*: He never said anything to that effect.

*The State*: In your opinion, did he understand what he was doing when he reviewed that form and you reviewed his rights with him?

*Sgt. Bragg*: Yes, sir. I even asked him, I mean, it's on the audio, do you understand this form.

Sgt. Bragg also testified that petitioner "was tired" but was "very aware of what was going on. He seemed like he just, basically, wanted to get it all over with." Sgt. Bragg further testified that he did not smell any alcohol on petitioner's breath and petitioner did not appear to be impaired by the use of controlled substances.

Sgt. Dewayne Bowles testified at the suppression hearing regarding what he saw as Sgt. Bragg administered petitioner's *Miranda* warnings. Specifically, Sgt. Bowles testified that petitioner "wasn't wired or just, he seemed tired and he was calm and cooperative" and that petitioner's statement "was as voluntary as any statement [Bowles had] ever been involved in taking."

In denying petitioner's motion to suppress his confession, the trial court found that

[petitioner], in his own testimony, opined . . . that at the time he gave his statement, he had significantly come down from his high, although he "still had a good buzz." He further opined that he had worked off a lot of his substances and that the stress of the situation, during the preceding evening, was taking away the impact of the drugs and alcohol, that he made his brain focus and that "takes away the buzz."

The trial court concluded that there was insufficient evidence to find "[petitioner] was intoxicated either on alcohol or illegal drugs to the extent that he was not competent to make a voluntary statement." The trial court further found that, based on the totality of the circumstances, "[petitioner] was, in fact, competent, was not significantly impaired, and was able to guard and protect his rights and, upon his own admission, he was not significantly impaired at the time he gave the statement." The habeas court concurred with the trial court conclusions. Based on our review of the record on appeal, we also concur with those conclusions. Accordingly, we find that the habeas court did not err in denying relief on petitioner's claim that his confession was involuntary and coerced.

For the foregoing reasons, we affirm the habeas court's July 20, 2017, order denying habeas relief.

Affirmed.

**ISSUED:** October 10, 2018

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Paul T. Farrell sitting by temporary assignment
Justice Tim Armstead
Justice Evan H. Jenkins

Justice Allen H. Loughry, II, suspended and therefore not participating.